## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | |
|---|---|
| **ERNEST N. FINLEY, JR.,** an individual, | ) |
| | ) |
| **Plaintiff**, | ) |
| | ) |
| v. | ) **CASE NO.: 2:23-cv-146-KKD-PBM** |
| | ) |
| **CITY OF MONTGOMERY, ALABAMA**, an | ) |
| Alabama Municipal Corporation; **MAYOR** | ) |
| **STEVEN L. REED**, an individual, | ) |
| | ) |
| **Defendants.** | ) |

## DEFENDANT CITY OF MONTGOMERY'S BRIEF IN SUPPORT AND EVIDENTIARY SUBMISSION IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Ernest Finley resigned from his position as Police Chief of the City of Montgomery on June 8, 2021, when the Mayor, Defendant Steven L. Reed, asked for and received Finley's resignation. Finley's term at the MPD had become a mess: the department was full of distrust, retaliation, confusion over which policies were in effect, there was a complete communication breakdown, the department was devoid of morale, and all this was occurring in a city ridden with crime.

And, yet, Finley has sued the City over his resignation. (Doc. 42.)

The only claims that survived this Court's dissection of Finley's Amended Complaint are as follows:

- Finley's Title VII retaliation claim in Count IX (and under 42 U.S.C § 1981, brought pursuant to 42 U.S.C. § 1983) as to conduct that occurred within the 180-day period before Finley filed his charge with the EEOC (August 4, 2021 to January 31, 2022);

- Finley's retaliation claim in Count IX under 42 U.S.C § 1981, brought pursuant to 42 U.S.C. § 1983;

- Finley's claim of race discrimination under 42 U.S.C § 1981, brought pursuant to 42 U.S.C. § 1983 (Count VI);

- Finley's claims pursuant to 42 U.S.C. § 1985 alleging conspiracy to violate civil rights found in Counts X and XI.

(Doc. 62 at p. 13, § III.)

Discovery has now ended and these remaining claims are due to be dismissed. First, as to his retaliation claims, the activities that occurred during 180-day period before Finley filed his charge with the EEOC (August 4, 2021 to January 31, 2022) was an Ethics Committee hearing on August 4, 2021, the September 1, 2021, article on the Ethics Committee charge, the failure to post any retractions, and a failure to rehire. These claims fail because Finley never engaged in a protected activity or suffered an adverse employment action, and he cannot causally connect any of two of those things during this time period; Finley cannot show that the Ethics Commission hearing on August 4, 2021, or any subsequent events, was in retaliation for any activity related to Finley's position as Police Chief that he resigned on June 8, 2021.

Second, as to his claims of Race Discrimination and for the same reasons,

Finley cannot connect any constitutional injury to his separation from the City.

Finally, based on the undisputed facts, there is not even an inference of any conspiracy between anyone not associated with the City or as to any activity adverse to his employment. The City of Montgomery is entitled to summary judgment on all of Finley's remaining counts.

## I.    STATEMENT OF UNDISPUTED FACTS: MORALE THROUGH THE FLOOR, CRIME THROUGH THE ROOF.

1.    The Chief of Police is the chief executive officer of the City of Montgomery police department ("MPD") and is responsible for the management, supervision of personnel, efficiency, and general conduct of the department. (Exhibit 1 - Reed Depo., p.221, ll.7-15.)

2.    The MPD Police Chief is appointed by and serves at the pleasure of the Mayor. (Ex. 1 – Reed Depo at p.83, l. 7-8; Exhibit 2 – Finley II Depo., p.438, ll.5-8.) The mayor is the only person with the authority to hire, fire, or discipline the Chief of Police. (Id. at p.438, ll.9-13.)

3.    Plaintiff Finley is a Black male, hired as Chief of Police of the MPD in 2014 by then-Mayor of the City of Montgomery, Todd Strange. (Exhibit 3 - Finley I Depo., p.27, l.15 – p.28, l.7.)

4.    In October 2019, Steven Reed, a Black male, was elected Mayor of the City of Montgomery and sworn into office in November 2019. (Ex. 1 - Reed Depo.,

p.9, ll.13-18; p.30, ll.18-19.)

5.      Mayor Reed's priority and concern was the homicide numbers. (Ex. 3 - Finley I Depo., p.47, ll.7-13.)   Mayor Reed wanted to get crime under control and make the city safer. (Ex. 1 - Reed Depo., p.230, ll.5-13.)

6.      During Finley's tenure, Finley and Mayor Reed held regular meetings with Finley where they discussed weekly updates on things that had happened over the weekend including administrative personnel, investigative issues, public safety matters, crime statistics, and other similar issues. (Ex. 1 - Reed Depo., p.75, l.22 – p.77, l.22.) Crime statistics were usually received weekly in a written report.   (Id.) When Reed and Finley met, Reed would discuss areas where Finley needed to improve the results given to the City's citizens. (Id. p.82, l.6 – p.83, l.1.)

7.      Finley testified that throughout the first "nine months [Reed wa]s the mayor, [Finley] felt really comfortable with the communications, with the direction that we w[ere][sic] going, that I can talk to him."   (Ex. 3 - Finley I Depo p. 62-63.)

8.      While Finely decided how many deputy chiefs he wanted to have (at times two, at times three) Mayor Reed approved the appointments of Finley's chiefs. (Ex. 2 – Finley II Depo., p. 421, l.18 – p. 423, l.3; p.436, l.12 – p.437, l.3.)

9.      Reed gave his Chief of Police the discretion to have the people he believed could best assist him in leading and managing the police department. (Ex. 1 - Reed Depo., p.259, l.12 – p.269, l.16; p.261, ll.12-16.)

10.    Mayor Reed did not personally observe anything about how Finley ran the Montgomery Police Department that he perceived was an ethics violation (Ex. 1 - Reed Depo., p.226, l.18 – p.227, l.5.) Although Reed did receive complaints that Finley disciplined haphazardly and/or only disciplined rank and file as opposed to the Command Staff.   (Id. p.225, ll.7-21.)

11.    On June 25, 2020, under Mayor Reed's administration, Finley appointed Jennifer Reaves, a white female.   (Ex. 2 - Finley II Depo., p.423, ll.4-23.) It was Finley's complete discretion to move officers within the ranks.   (Id., p.424, ll.6-15.)   For example, Finley reassigned an officer from the position of Chief of Operations because he lost confidence in that officer's ability.   (Id., p.424, ll.1-5.)

12.    Mayor Reed approved Finley's appointments.   (Ex. 2 - Finley II Depo., p.436, l.12 – p. 437, l.3.)

13.    No one with the City, including Mayor Reed, ever told Finley not to appoint or promote a person because they were white or female. (Ex. 2 - Finley II Depo., p.437, ll.4-23.)   Similarly, no one with the City, including Mayor Reed, ever told Finley to demote someone because of their race or because they were a female. (Id. p.437, l.20 – p.438, l.4.)   The Mayor never asked Finley to demote or reassign Reaves. (Ex. 3 - Finley I Depo., p.105, ll.17-22.)

14.    Finley admitted that, in fact, no one with the City, including Mayor Reed, ever told Finley to demote someone because of their race.   (Ex. 2 - Finley II

Depo., p.437, l.20 – p. 438, l.13.)

15.    On September 22, 2020, an MPD police officer received a call from the Woods RV Park about their dissatisfaction with MPD security.    Webster v City of Montgomery, 710 F. Supp. 3d 1116, 1121 (M.D. Ala. 2023). "Reaves and other MPD officials began reviewing the off-duty coordinator's records and discovered that certain officers had undertaken courtesy positions at multiple apartment complexes simultaneously. Unless these officers were maintaining more than one residence, they were not living in at least some of the apartment complexes that hired them. Within a few days, MPD released an updated off-duty employment policy that explicitly limited courtesy officers to in-kind compensation."    Id.

16.    On October 1, 2020, Reaves sent Finley a memorandum requesting an investigation of Lt. Ferguson, Lt. Mackey, Lt. Webster, Sgt. Ware, and Sgt. Harris— each of which is black—for possible ethical violations and policy violations regarding off-duty employment.    (Exhibit 4 – Reaves' October 1, 2020, Request for Investigation Memo; Ex. 2 - Finley II Depo., p.384, ll.1-13.) The memo set forth that five officers allegedly manipulated the system, or double-dipped, by being on the City payroll and getting paid for extra off-duty jobs. (Ex. 3 - Finley I Depo., p.199, l.16 – p.200, l.23.)

17.    City Investigations ("CI") investigated these officers, and the investigation grew beyond the initial five to thirteen officers. (Ex. 2 – Finley II

Depo., p.385-386.)

18.    "In December 2020, [CI] charged Webster, Ware, and Harrison with violating MPD's off-duty employment policy by presenting themselves as courtesy officers without living on the properties they served. The officers were charged under the old version of the policy, which had not stated outright that courtesy officers could accept in-kind payment only.   According to [CI], the rules governing courtesy officers and their compensation may have been unwritten, but they were well-known and well-established throughout MPD."   <u>Webster</u>, 710 F. Supp. 3d at 1121.

19.    Finely received a report from CI at the end of the investigation.   (Ex. 2 - Finley II Depo., p.385, l.22 – p.386, l.2; Exhibit 5 - Bellinger Depo., p.39, ll.16-19.) The report from CI did not include a recommendation for discipline. (Ex. 5 - Bellinger Depo., p.39, ll.11-15.)

20.    Finley believed these officers' conduct violated policy, there was an investigation into the officers' use of their off-duty work, and he believes the investigation was fair.   (Ex. 3 - Finley I Depo., p.51, l.17 – p.53, l.7.)

21.    In contrast, Officer Webster, one of the investigated officers, believed that Reaves and Finley had concocted the investigation into the off-duty employment because the complaint that came in from the apartment complexes where there was "crimes and things in the area," rather than the conduct for which he was charged.

And he believed that Reaves disciplined white officers less harshly than she did black officers and that it was based on race. (Exhibit 6 - Webster Depo., p.107, l.8 – p.108, l.10., p.125, l.10 – p.127, l.21.)

22.   Finley alleged and testified that in December 2020, there was a meeting regarding this off-duty employment where Mayor Reed, Chip Hill (Mayor Reed's Chief of Staff), Retired Montgomery Circuit Court Judge, Hon. Charles Price, Stacy Bellinger (City Attorney), and Bill Barousse (City Investigations Chief) were in attendance.   (Doc. 42 at ¶ 26; Ex. 3 – Finley I Depo, p.53-54.)

23.   At this meeting, Finley alleges, "[w]hen we left - - at the conclusion of that meeting, it was recommended termination. Everybody agreed."   (Doc. 42 at ¶ 26; Ex. 3 – Finley I Depo, p.53-54.)

24.   After this meeting, Finley alleges that Mayor Reed's assistant—Jamilya Philyaw—called him to tell him that a "little birdie" was telling him to go with "Option 2," so Finley "directed . . . [Deputy] Chief Reaves to go ahead and redo the complaint with option two, that is twenty-day suspension, demotion, a year of suspension from work on all off-duty jobs as well as forwarding the complaint to the Ethics Commission for investigation.." (Ex. 3 – Finley I Depo, p.173-174.)

25.   Finley said that he obeyed because "the way my relationship with the mayor was at that time, he would come after me" if Finley were to commit insubordination and not give the MPD Officers the lesser punishment that Mayor

Reed's "little birdie" had allegedly requested.   (Ex. 3 – Finley I Depo p.54-55.)

26.     Finley admitted that the Mayor had the discretion to agree with the termination recommendation or to make another decision. (Ex. 3 - Finley I Depo., p.56, ll.2-7.)   In fact, Finley testified that both Mayors he served under – Mayor Reed and Mayor Strange – did not always follow his discipline recommendations and that there was "no difference" between how Mayor Strange responded to Finley and how Mayor Reed responded to Finley.   (Id., pp. 33-34, l.12-9.)

27.     Apparently, Finley and Mayor Reed's relationship was not so bad that Finley could not confront him: on or around May 13, 2021, nearly five months after this December 2020 meeting, after Mayor Reed and Chief Finley disagreed about the punishment for the off-duty violations, Finley "let the [M]ayor know that I'm going to have a discussion with Daryl Bailey, the district attorney. The mayor kind of questioned me of why are you doing that, and then he took a deep breath and said okay. And a week later, I get charges against me for the ethics violation." (Ex. 3 – Finley I Depo, p. 202 l.1-8.)

28.     Finley did receive notice of the "charges against" him on or about May 20, 2021 (Exhibit 7 - Ethics Commission letter to Finley), Officer Webster, who filed the charges, did so on November 3, 2020.



(Exhibit 8 – Webster's Ethics Commission Complaint).    This Complaint pre-dates, any "alleged" disagreement between the Mayor and Finley about the off-duty discipline.

29.     During the week of October 19, 2020, MPD held its annual Firearms Qualifications. (Ex. 2 -Finley II Depo., p.264, ll.4-12.)

30.     On October 20, 2020, in preparation for this qualification, MPD Chief of Staff Zederick Dean sent an email to Command Staff. (Exhibit 9 - Dean Depo., p.300, ll.2-23, Exhibit 10 - Dean Email re Qualification). In that email, Dean wrote, "Please remind any of your personnel who failed qualifications will not be able to work off-duty jobs until they clear remedial."   (Ex. 10.)

31.     Dean's email illustrated that MPD officers did face discipline for failing the qualifications, but there was significant confusion regarding the policies.   The following procedural history highlights this confusion:

32.     MPD Policy 2.311, effective September 11, 2012, entitled "Firearms Qualifications," required an officer to score no less than 76 in two attempts of qualifications held twice a year. (Exhibit 11 – MPD 2.311; Ex. 2 - Finley II Depo.,

p.273, l.21 – p.275, l.12.) Under this version, there were penalties for failure to qualify, including termination, a 40-hour remedial class, and loss of off-duty employment opportunities. (Id.; Ex. 5 – Bellinger Depo p.255, l.10 – p.256, l.3; p.256, l.4-11.)

33.    Policy 3.2.4 regarding weapons in training purported to rescind Policy 2.311 when it took effect on June 25, 2018. (Exhibit 12 – Policy 3.2.4; Ex. 2 - Finley II Depo., p.276, l.10 – p. 278, l.21.) Policy 3.2.4 required an officer to receive a qualification score 76 during two attempts. (Ex. 12.) It removed most of the penalties, but it left in place the fact that the officer must successfully complete remedial training before resuming official duties.   (Id.)

34.    Effective January 15, 2020, Policy 3.2.4 was amended but carried the same requirement of receiving a qualification score of 76 during two attempts with a penalty of successful completion of remedial training before resuming official duty. (Exhibit 13 – Policy 3.2.4, effective January 2020.)

35.    "PowerDMS" is an online portal available to MPD officers where these policies were stored and available for reference.   (Ex. 5 - Bellinger Depo., p.256, ll.19-21; Ex. 9 - Dean Depo., p.73, l.12 – p.74, l.6.)   If a policy is replaced, updated, or amended, the old policy should not be on PowerDMS. (Ex. 9- Dean Depo., p.241, l.23 – p.242, l.6.)

36.    Despite the amendments and replacements to the MPD firearm policies,

Policy 2.311 was in PowerDMS.   (Ex. 5 - Bellinger Depo., p.256, ll.19-21; Ex. 9 - Dean Depo., p.73, l.12 – p.74, l.6.)

37.     Because of this, Deputy Chief Dean wrote his email as he thought that, according to Policy 2.311, officers would lose off-duty work if they failed to qualify. (Ex. 9 - Dean Depo., p.300, ll.2-23.)

38.     On Tuesday, October 20, 2020, former Deputy Chief Jennifer Reaves failed to qualify with her firearm. (Ex. 2 – Finley II Depo., p.339, ll.3-22.)

39.     At some point that day (October 20, 2020) Finley, who was at the range, decided to allow any officer who failed to qualify a third attempt, changing the policy in the field, he stated: "everybody deserves a third round, [but] don't advertise it…" (Ex. 2 - Finley II Depo., p.265, l.17 – p.266, l.17; Exhibit 14 – June 3, 2021, Finley's Firearm Memo.) Finley advised Sgt. Killough that a memo would be forthcoming to make it clear that officers have an opportunity for a third attempt because he was changing the policy. (Ex. 2 - Finley II Depo., p.268, l.21 - p.270, l.13.)

40.     Finley directed Captain Milner to notify everyone that an opportunity would be given for one more attempt to qualify on Thursday, October 22. (Ex. 14 at p. 2; Ex. 2 – Finley II Depo., p.323, l.3 – p.324, l.17.)

41.     On Wednesday, October 21, 2020, at 10:59 p.m.—the end of the third day of the October 2020 Qualifications—Captain Miliner sent an email out advising that anyone who had failed to qualify during their first two attempts would be given

a third opportunity on Thursday, October 22, 2020. (Exhibit 15 – PX1, Miliner Qualifications Email, at p. 4; Ex. 2 – Finley II Depo., p.339, l.23 – p.340, l.10; Ex. 6 – Webster Depo., p.72, l.12 – p.73, l.7.)

42.    The City Attorney, Stacy Bellinger, then directed Finley to "send out a memo directing all the officers [who did not qualify in two attempts] to do an eight-hour remedial." (Ex. 2 – Finley II Depo. p. 348, l.12-18.)   City Attorney Bellinger advised Finley that even though he could change the policy, the remedial training still needed to be carried out for those who had failed to qualify on two attempts. (Ex. 5 - Bellinger Depo., p.148, l.21 – p.150, l.2.) Her concern was not that he changed the policy but that it was a verbal change in the middle of the qualifications. (Id. p.150, l.18 – p.151, l.7.)   Bellinger reached out to Finley regarding her concerns about requiring the officers to attend remedial training and was advised that they had not done so. (Id. p.157, l.13 – p.158, l.3.)   However, Finley indicated he would make it happen. (Id. p.158, l.15 – p.159, l.1.)

43.    Because of Finley's in-field change in the firearms qualification policies, Officer Webster, who had been disciplined in the off-duty work scandal (see ¶ 21, supra) commenced two internal complaints on October 23, 2020.   (Ex. 2 – Finley II Depo., p.317, l.18 – p.320, l.3, p.357, l.14 – p.358, l.1-10.)

44.    Because some officers had already failed prior to Finley verbally changing the policy in the field on October 20, 2020, Finley's policy "change"

caused chaos because MPD officers had already been written up for failing to qualify.   (Exhibit 16 – Denise Barnes Depo., p.283, l.1 – p.284, l.9.)

45.     On November 3, 2020, Finley officially changed the firearms qualifications policy to be effective the same day, lowering the score from a 76 to a 70 and providing all shooters with three qualification attempts instead of only two. (Exhibit 17 – MPD Policy 3.2.4 amended November 3, 2020; Ex. 2 – Finley II Depo., p. 272, ll.1-17, p. 291, l.11– p. 293, l.6).

46.     November 3, 2020, is also the same day that Officer Webster filed his complaint against Reaves and Finley with the Alabama Ethics Commission ("AEC"), alleging that on October 20, 2020, Finley changed the City Policy to protect Deputy Chief Reaves from discipline for failing departmental handgun qualifications.   (Ex. 8.)

47.     Officer Webster did not talk to anyone with the Alabama Ethics Commission ("AEC") before filing his complaint on November 3, 2020. (Ex. 6 - Webster Depo., p.80, l.6 – p.81, l.3.)

48.     City Attorney, Stacy Bellinger, handled matters involving the AEC as part of her official job duties. (Ex. 5 - Bellinger Depo., p.22, ll.17-19.) Once Bellinger realized there were multiple policies on firearms, she spoke with AEC's investigator, Byron Butler, and advised him that there were policies that should have been archived but were not. (Id., p.182, l.17 – p.183, l.18.) Bellinger is the one who

initiated the fact that there were multiple policies on handgun qualification with Butler. (Id., p.195, ll.11-15.) She did so because Lt. Carson had made her aware that 2.311 should have been archived and was not. (Id., p.195, l.16 – p.196, l.11.) She wanted to be clear "about the confusion at MPD and why a policy that wasn't in effect was produced and what we were producing." (Id.) When she forwarded the letter about the policy change, she also sent the policies. (Id., p.197, ll.6-9.) Bellinger advised AEC Investigator Butler that neither Finley nor Reaves had any financial gain from the change in the handgun qualification policy. (Id. p.185, ll.11-15.) She also told Butler that based on everything they had looked at, it was their opinion that there were no ethics violations. (Id., p.184, l.15 – p.185, l.6.)

49.    As admitted by Finley, Bellinger provided fair and correct information to the Ethics Commission. (Ex. 3 – Finley I Depo., p.89, l.20 – p. 90, l.3.)

50.    Mayor Reed did not know anything about the Ethics Complaint, filed by Webster, against Finley:

```
12    Q.  Do you know what the ethics
13         complaint was about?
14    A.  No. Well, now I know. We've got
15         to get ready for this deposition. So I know
16         now, but I didn't know at the time.
```

(Ex. 1 – Reed Depo at p. 213, l.12-16.)

51.    Mayor Reed never talked to anyone at the Ethics Commission about Jennifer Reaves; he never partnered with AEC Investigator Butler on anything; and

he was not aware that MPD Marcus Webster was the person who complained or filed the ethics complaint against Finley and Reaves. (Ex. 1 - Reed Depo., p.196, l.8 – p.197, l.8; p.209, ll.16-19; p.212, ll.3-6.)

52.    Similarly, Finley has no evidence that the Mayor forwarded false and fraudulent information to the Ethics Commission. (Ex. 2 – Finley II Depo., p.454, l.17 – p.457, l.12.)   He has no evidence that Reed conspired with Butler and/or Cynthia Raulston, AEC General Counsel,[1] to manipulate evidence. (Id., p.457, l.13 – p.458, l.16.)

53.    On January 19, 2021, Chief Finley sent Bill Barousse, Chief of City Investigations, a request for an investigation into Major Denise Barnes.   (Exhibit 18 – January 19, 2021, Finley to Barousse Requesting Investigation into Barnes.) The grounds for Finley's allegation were as follows:

> On January 18, 2021, I received reliable and confidential information from an employee, who wished to remain anonymous. The essence of this provided information creates a hostile work environment that goes against MPD's policies and procedures. Listed below are the contents of my conversation:
>
> The confidential source stated that a member of my staff complained about Major Denise Barnes inciting division in the department. The staff member stated that Major Barnes told him/her that Chief Reaves is against all black women in the department. The staff member further stated

_____

[1]  Byron Butler and Cynthia Raulston are the Defendants in Reaves and Finley's suit before this Court, 2:23-cv-464-KKD-PBM - Doc. 66.

that he/she was told by Major Barnes that Barnes and other back female staff members were going to make trouble for Chief Reaves by being defiant and making complaints to the Office of City Investigations. The staff member felt that he/she was being pressured to join in this plot against Chief Reaves.

Therefore, I am requesting the Office of City Investigations conduct an investigations on Major Denise Barnes for possible City and/or Montgomery Police Department policy violations.

(Ex. 18.; see also Ex. 2 – Finley II Depo., p.393, l.10 – p.398, l.12.)

54.    Finley learned the name of the "confidential source" from an MPD department, Peer Support, which is supposed to be confidential.   (Ex. 2 – Finley II Depo., p.398, l.13 – p.399, l.2; p.401, ll.14-16.)   Finley was occasionally told confidential information on a need-to-know basis. (Id.)

55.    At some point, presumably before Finley's January 19, 2021, request for an investigation, Finley asked Bill Barousse to interview the confidential source whose name Finley did not mention in the January 19, 2021, memo.   (Ex. 2 – Finley II Depo., p. 399, l.20 – p.401, l.13; Ex. 3 - Finley I Depo., at p. 130, l.23 – p. 131, l.16.)

56.    Finley acknowledged that obtaining confidential information from peer support is one of the complaints officers had against Finely that caused mistrust. (Ex. 2 – Finley II Depo., p.403, l.8 – p.405, l.6.)

57.    Even though he sent this Memo to Bill Barousse, Finley admits that he

never heard or received communications from anyone about Jennifer Reaves's race or gender and is not aware of any time that any member of his staff discriminated against Reaves because of her gender or her race  (Ex. 2 -Finley II Depo., p.419, l.1 – p. 421, l.9.)

58.    Rather, Finley believes the harassment Reaves complained about was tone of voice, responsiveness to assignments, and disrespectful communication styles by Major Barnes. (Ex. 2 – Finley II Depo., p.411, l.13 – p.412, l.5.)

59.    On January 13, 2021, an MPD Officer, Sgt. J.D. Thagard, filed a complaint with [CI] against Finley, alleging that Finley violated City Policy on Protected Communications and Anti-Retaliation when he denied Thagard's request to meet with the Mayor regarding a hostile work environment complaint against Lt. Carlisle.  (Exhibit 19 - PX81 Thagard Complaint file.)

60.    Sometime between January 13, 2021, and April 29, 2021, the City hired an independent HR Consultant, RLG Consulting LLC, to investigate these findings. On April 29, 2021, RLG provided Bellinger with an investigative report, in which RLG concurred with CI's substantiating the allegations against Chief Finley.  (Ex. 19 at p. 20-28.)

61.    RLG added some "recommendations," including:

Chief Finley does not apologize for his strong leadership style. In his words, "He doesn't play." His confident, authoritative, and military style of leadership has had an

impact on the department, both positively and negatively. In speaking with his Chief of Staff Dean, there is a degree of trepidation of speaking truth to the Chief. Care should be taken in handling personal relationships, because the possibility of that "clouding judgment" is a real concern. It could be costly down the road to the Department. Chief of Staff Dean acknowledged that often he is left out of the loop when it comes to the chain of command. He acknowledged that individuals. Lt. Carlisle especially, would go past him to the Chief and he would be left out of the loop. He and Captain Gambrell who previously had served as captain over the Academy spoke about how Lt. Carlisle would speak directly with the Chief and the Chief gives him instructions that he would pass on to everybody else. **This frustrated those in the chain of command**. The ability to speak truth to your leadership is crucial to maintaining trust and fairness throughout the department.

(Ex. 19 at p. 28 (emphasis added).)

62.    On the same day—April 29, 2021—City Attorney Bellinger sent RLG's investigative report to Mayor Reed through Chip Hill.   (Ex. 19, at p.1.)

63.    The City's policies prohibiting discrimination, harassment, and retaliation are in the City County Personnel Handbook. (Ex. 1 - Reed Depo. p. 88, l. 8 – p. 89, l. 20; Exhibit 20 - City Handbook pp. i, 32-41.)

64.    Finley was provided with the City and County Montgomery Personnel Board's Rules and Regulations and the Handbook when he was first hired. (Ex. 2 - Finley II Depo. p.379, l.21 – p.380, l.5). He understood under both that the City prohibited discrimination or harassment because of political or religious opinions or affiliations and race, national origin, sex, or gender. (Ex 2 – Finley II Depo., p.380,

ll.6-21).

65.    On April 6, 2021, the Montgomery City Council met for a Work Session before their regularly scheduled meeting.   (Doc. 42 at ¶ 43.)

66.    The MPD Command Staff were required to attend City Council Meetings.  (Ex. 16 -   Barnes Depo., p.109, l.20 – p.110, l.21.)

67.    Seven officers, one attorney, and one preacher spoke at this April 6 Work Session. https://www.youtube.com/watch?v=0pjahvrGU7k.[2]  Finley alleges that "Denise, Saba, Major Coleman, were very instrumental in organizing Lieutenant Webster and a litany of about twenty black officers to go to City Hall and to berate and embarrass and humiliate me in front of city council, the mayor."   (Ex. 3 – Finley I Depo, p. 108, l.21 – p. 109, l.3.)

68.    After requesting and receiving additional time (an increase from 3 to 5 minutes), each of the then and former officers – including Marcus Webster and Jacoby Thagard – aired their grievances/experiences regarding the MPD's disarray, putting forward specific allegations composed of unique instances, featuring a single common denominator: retaliation for complaining about Command Staff, including Chief   Finley.      https://www.youtube.com/watch?v=0pjahvrGU7k.      (Ex.   6   -

---

[2] Montgomery City Council are posted and available on the City's YouTube Channel (www.youtube.com/@MontgomeryCCC.)   The individuals that Finley complains of aired their grievances beginning at the 22-minute mark and proceed through 1:12:00.

Webster Depo., p.93, l.18 – p.94, l.6.)

69.     Finley alleges that before this Work Session, Mayor Reed learned "the subject matter of these officers [and] the purpose of that is to humiliate and embarrass me and my way of policing or way of managing."   (Ex. 3 – Finley I Depo. p. 188, l.10-14.)

70.     In fact, according to Finley, Mayor Reed "had the **duty to quell** that negative discussion that's a violation of policy in terms of the disparaging remarks about department heads. He allowed that to fester. He also encouraged officers when they made those allegations against me is to see him on another note and that he will look into those complaints. As such, he opened up an investigations against me dealing with the hostile work environment that was sustained. It was opened, reopened. It was investigated initially by City Investigation. It was unfounded. Based on the encouragement of the mayor, he reopened that investigation and saw fit to see that it was sustained."   (Ex. 3 – Finley I Depo, p. 186-187 (emphasis added).)

71.     Putting aside Finley's amazing stance on a superior's duty to quell "negative discussion" (i.e., allegations) about department heads, Mayor Reed testified he did not meet with any of the officers before the City Council meeting. (Ex. 1 - Reed Depo p. 121-122.)   Reed says "at some point" he was aware that the officers wanted to speak to the City Council about their discipline, but "think[s] it was in the meeting;" he did not remember who told him, and "d[id not] even know

if [he] knew prior to the meeting where they did speak. [He did not] remember knowing before then. But if [he] did, somebody may have told [him]."   (Id. p. 120.)

72.     Stacy Bellinger, the City Attorney, testified that "generally to speak at a city council meeting, you have to sign up with the city clerk, and [Bellinger] would get the names of individuals who have signed up to speak." (Ex. 5- Bellinger Depo p. 63, l. 3-18.)   Bellinger did not "know that they were on the list provided by the city clerk," but "just kn[e]w that [she] knew prior to their - - them attending the council meeting and addressing the city council that they were going to be there, but [she] d[id not] recall how [she] got that information."   (Id. 65-66.)

73.     The placement of the officers on the work session's agenda is set by the City Council, and the Mayor does not have the authority to put anyone on the agenda. (Ex. 1 - Reed Depo., p.123, ll.3-14.)   At the City Council meetings, Reed is not usually aware of who is signed up to speak before the meetings. (Id., p.121, ll.11-20.)   His role is to give the Mayor's message at the beginning of the meeting.   (Id.)

74.     Despite this, Finley alleges that, before the meeting, "The [M]ayor told [Finley] that [Finley] could not speak out, to remain quiet as it would blow over and not to worry about it.'"[3]   (Ex. 3 – Finley I Depo, p. 109, l. 14-16; 188, l. 14-22; 196-

---

[3] There is an immaterial factual dispute over whether Mayor Reed had any such conversation with Finley or Reaves. Mayor Reed does not remember meeting with Finley or Reaves before the City Council Meeting or telling them that the officers would speak or that Finley was not to speak at the City Council meeting.  (Ex. 1 -

199).

75.    On June 8, 2021, Chief Finley resigned as Chief of MPD, in good standing, and at Mayor Reed's request, to be effective on July 8, 2021.   (Exhibit 21 – Finley's Resignation letter.)

76.    Immediately before the resignation meeting, Chip Hill, who was present at the resignation meeting, met with Finley privately in Hill's "office with the door closed" for "10, 15 minutes" and told Finley "I'm really sorry for the short notice," but, pursuant to Hill's "commitment" to Finley to "do everything within [Hill's] power that he would not be blindsided," Hill told Finley "the mayor is about to ask for your letter of resignation."   (Exhibit 22 - Hill Depo. p. 116 – 122, l. 21.)

77.    Finley states he was "basically [told by Mayor Reed] that my services were no longer needed," "that crime is going in the wrong direction," "[a]nd that was about it, if [Mayor Reed] said anything."   (Ex. 3 – Finley I Depo, p. 118, l.20 - p. 119, l.3.) When Finley said he would not sign it, Mayor Reed told him, according to Finley, "we can do this the easy way or the hard way."   (Id. p. 11, l.3 – p. 12, l.21 (Finley alleges he "resigned" "[f]orcefully under duress, under threat and intimidation")).

78.    Finley agreed that, although he did not know at that time that he would

---

Reed Depo p. 122-123.)

be terminated, the Mayor had the authority to terminate him.  (Ex. 3 – Finley I Depo., p.225, ll.1-10.) And, to avoid being terminated, Finley signed the resignation letter.  (Id. p. 16, l. 6-9.)

79.    Finley was granted thirty days of administrative leave with pay, making his last day as a paid employee of the City, July 8, 2021.   (Ex. 3 – Finley I Depo, p. 16-17.)

80.    When asked at his deposition what Mayor Reed meant about "the numbers", Finley knew immediately that the Mayor was referring to the crime numbers, specifically referring to the homicide numbers.  (Ex. 3 – Finley I Depo p. 226-32.)   Finley conceded that the homicide numbers were the highest in 2020 that they had ever been prior to the early 1970s, and up again in the first quarter of 2021, the quarter immediately before Finley's separation.   (Id.)

81.    Mayor Reed testified that Finley's separation "had nothing to do with the [Ethics Commission] investigation at all. It had everything to do with those things that we discussed earlier, the morale, the performance, the perception, time in the office, those things."   (Ex. 1 – Reed Depo. p. 208, ll. 6-13.)   In seeking Finley's replacement, Mayor Reed testified that he considered the right person to be "Someone who had a better approach on where we wanted to take public safety in the city."   (Id. p. 171, ll. 17-21.)

82.    Finley "underst[ood] [his] position as in the state of Alabama is at

will….”  (Ex. 3 – Finley I Depo, p. 226, l.1-5.)   In fact, Finley admits he served at

the pleasure of the Mayor, and that Mayor Reed, at the time of the June 8, 2021,

Resignation Meeting, had the authority to terminate Finley.   (Id. p. 224-25.)

83.    Finley also admits that he had other avenues, even besides resigning or

being terminated, testifying that “[i]f I would decide to fight it, I would have fought

it. Yes, it would have been - - I wouldn’t have - - I wouldn’t have signed anything. I

would have got an injunction. I would appeal to the city council and the personnel

board to keep my job and to make it difficult for him to fire me on the spot without

due cause.”  (Ex. 3 - Finley I Depo, p. 225, l. 11-23.) (See also Ex. 2 - Finley II

Depo, at p. 438, l.9 – p.439, l.5).

84.    On June 8, 2021, the date of Finley’s resignation, WSFA posted an

article regarding Finley’s resignation, in part, quoting Mayor Reed:

> “While violent crime rates have climbed across the nation,
> Montgomery has fared much better than other cities our
> size; but I am convinced we can and must do more. Chief
> Finley has done a tremendous job with the task he
> inherited in 2015. Notably, Montgomery was the only
> major city in the state of Alabama that did not suffer
> damage during last summer’s civil unrest, but the situation
> and circumstances have changed. I feel it is in the best
> interest of the men and women of the Montgomery Police
> Department, as well as the residents of Montgomery, to
> make a change in leadership.”

(Exhibit 23 – June 8, 2021 WSFA Article, at p. 1).

85.    On June 15, 2021, the Montgomery Advertiser published an article

addressing Finley's resignation, quoting Mayor Reed, and noting Reed was "applauding" and "prais[ing]" "some of [Finley's] accomplishments in Montgomery" and "thank[ing] Finley and his family for their contributions to the city." (Exhibit 24 – June 15, 2021 Advertiser article.)

86. Although Finley complains about the Mayor, he admitted:

9 Q. It is not your position that, for
10 example, the city council terminated you?
11 A. Correct.

(Ex. 3 – Finley I Depo. p. 73, ll.9-11.)

87. Finley also admitted that he did not ask the City Council to rehire him, did not ask anyone with the City to rehire him and did not seek the City's Personnel Board to rehire him. (Ex. 3 – Finley I Depo. p. 73-74.)

88. Finley complains that "After Finley's constructive termination and forced resignation, the City failed to acknowledge his retirement and years of dedicated service to the City of Montgomery," whereas, "[i]n contrast, on February 21, 2023, the [MPD] publicly recognized Major Ramona Harris' retirement celebration and acknowledgement publicly, on social media and within the [MPD] and the City,…." (Doc. 42 ¶¶ 204, 205.)

89. There is no evidence that Finley ever asked the Mayor or anyone at the City to publicly (or otherwise) celebrate his retirement.

90. Mayor Reed had nothing to do with the retirement celebration of

Ramona Harris. (Ex. 1 - Reed Depo., p. 271, ll.5 – p. 274, ll.22.)

91.    Mayor Reed and the City conducted a national search for a permanent police chief and sent an internal request for candidates.    (Ex. 1 - Reed Depo p. 170, ll. 14-22). <u>Compare</u> Exhibit 25 - PX86 June 21, 2021 Email Announcing Interim Chief Position.

92.    Although Finley alleges that "[t]he City did not reinstate Finley to his former position or restore his pay," (see Finley's Amended Complaint at 36, ¶ 203), there is no evidence that Finley applied for the Interim or Permanent Chief of Police position, or any other employment with the City, following his separation.   (Ex. 3 – Finley I Depo. p. 73-74.)

93.    On August 4, 2021, the Ethics Commission met and heard the allegations against Finley and Reaves stemming from Marcus Webster's complaint (Ex. 8) of November 3, 2020.   (Doc. 42 at ¶¶79, 80.)

94.    The result of the hearing was that the Commission found cause to hold that Finley had committed one minor violation of the AEC.   (Doc. 42 at ¶¶79, 80.)

95.    On August 4, 2021, WSFA published a news article about the Ethics Commission Findings.   (Exhibit 26 – August 4, 2021, Article). The text of the article followed a photograph of Finley with the caption under it: "The Alabama Ethics Commission found Montgomery Police Department Chief of Operations Jennifer Reaves and former Police Chief Ernest Finley each committed a minor

violation of the Alabama Ethics Act. (Source: WSFA)."   (Ex. 26.)[4]

96.    On September 1, 2021, WSFA published another article entitled "Interim Montgomery police chief: Department moral is 'coming back around.'" (Exhibit 27 – September 1, 2021, WSFA article "PX24".)   As is evident from the document itself, this is not a press release by the City of Montgomery.   (Id.)[5]

97.    Regarding the September 1, 2021 Article, Acting Chief, Ramona Harris, who made the "'morale is coming back around'" statement, denied discussing the short statement in the article regarding Finley during her interview (Exhibit 28 - Harris Depo., p.182, l.3 – p. 183, l.6), but admitted making the "'morale is coming back around'" statement.   (Id.)   She explained it as just one of her goals in taking over as interim Chief, and one thing she felt needed to be addressed within the MPD: "[M]orale is always something that throughout departments in law enforcement in my career and experience…goes up and down," "something that requires constant work," and "So that's just a … general statement of what [is] already going to have to be repaired or fixed within a department for a media

_____

[4] This is presumably the article Finley refers to in his amended complaint: "Without waiting for the Ethics Commission to issue its formal finding, the City and Reed caused a press release to be circulated to the various media outlets reporting the vote and findings of the Ethics Commission. Reed issued this press release so as to disparage and defame Finley and to damage his personal and professional reputation."   (Doc. 42 at ¶ 81.)

[5] Mayor Reed does not sanction articles by news outlets. (Ex. 1 - Reed Depo., p.295, l.14 – p.297, l.1.)

statement." (Id. p. 186, l.20 – p.187, l.19.)

98.    On November 18, 2021, the Alabama Attorney General Steve Marshall

("AG") sent a letter to the declining to take any further action against Finley.   (Doc.

42 at ¶ 86).

99.    Finley does not know of any communications between Mayor Reed and

the Ethics Commission either:

> Q: I just thought of something, do you know of any
> conversations or communications that Mayor Reed would
> have had with Cynthia Raulston?
> A: As I stated earlier that I do believe, and I don't have
> anything concrete, that there may have been a
> conversation with the mayor, Butler, Cynthia Raulston --
> Cynthia Raulston in terms of the direction of the ethics
> complaint. That's all I have.
>
> So I don't have anything concrete to put these three
> together in terms of recruiting those officers to file a
> complaint, to give statements, and submit false evidence.
> But I do believe and it's my opinion, I can't substantiate it,
> that there was some conversation between the three in
> terms of solidifying his position to separate me from the
> department. I can't prove it, but there was some
> communications.
>
> Q: … Tell me what you think contains the exculpatory
> evidence that should have been provided to you form that
> conversation.
> A: I'm just going to my take on that is based on the email
> that was offered to Byron, the new policy and that in
> subsequent conversation with her emails with her it
> appears that he didn't take head to the new policy and he
> was headstrong on the old policy in terms of actively
> pursuing charges against me."

> Q: … is it fair to say that you have no direct knowledge of any of the conversations that you say were exculpatory evidence?
> A: Correct

(Ex. 3 – Finley I Depo p. 141, l.15- p. 142, l.3; p. 219– 220; Ex. 2 – Finley II Depo, p. 369, ll.6-23).

100.   Finley also admitted:

Q: Is it fair that none of the city council members had any kind of interaction or conversation with Byron Butler?
A: Yes, safe to say.

(Ex. 3 – Finley I Depo. p. 91, l.21 – p. 92, l.2.)

101.   Nevertheless, on January 31, 2022, Finley filed an EEOC charge. (Doc. 42-1).

## II.    STANDARD OF REVIEW.

Under Fed. R. Civ. P. 56(a), a summary judgment "movant must show that 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Chandler v. Louisiana-Pac. Corp., 2022 WL 15570702, at *12 (S.D. Ala. Oct. 27, 2022).    In resolving factual disputes, the Court draws all reasonable inferences in "the light most favorable to the nonmovant."  Id. (citation omitted). However, inferences "can be based only on evidence—not on speculation." Berry v. Crestwood Healthcare LP, 84 F.4th 1300, 1311 (11th Cir. 2023) (quotation omitted).

Although the movant bears the initial burden, which "includes identifying portions of the record illustrating the absence of a genuine dispute of material fact," "a movant who does not have a trial burden of production can assert, without citing the record, that the nonmoving party 'cannot produce admissible evidence to support' a material fact." See Chandler, 2022 WL 15570702 at *12.    If the movant meets its burden, the burden shifts to the nonmoving party, who must 'go beyond the pleadings' and submit admissible evidence demonstrating 'specific facts showing that there is a genuine [dispute] for trial.'"    Sheppard v. Mercedes-Benz U.S. Int'l, Inc., 2024 WL 235220, at *1 (N.D. Ala. Jan. 22, 2024).    The nonmovant "'must do more than simply show that there is some metaphysical doubt as to the material fact.'" Id. at *1 (quotation omitted). "'[C]onclusory assertions,' without admissible supporting evidence, 'are not sufficient to withstand summary judgment.'"    Webster, 710 F.Supp.3d at 1120.

## III.    ARGUMENT.

Most of Finley's allegations in his Amended Complaint were dismissed. The four areas that survived "[u]ntil the facts are developed further…" (Doc. 62 at 9) are now due to be dismissed.

**A.    No adverse employment actions occurred on or after August 4, 2021, the start of the 180 days preceding the filing of his EEOC charge, that could constitute unlawful retaliation under Title VII; (Count IX) is now due to be dismissed in its entirety.**

Finley filed his EEOC charge on January 31, 2022.  (Doc. 42-1.)  Because Finley's last day with the City was June 8, 2021, the City moved to dismiss all of his Title VII unlawful retaliation claims for failure to exhaust his administrative remedies.   This Court held "his EEOC charge of January 31, 2022, would have been timely filed as to these acts of alleged retaliation:

- After Finley engaged in protected conduct, the City of Montgomery caused false complaints to be brought against Finley before…the Alabama Ethics Commission.
- Finley also alleges misconduct by the City during the ethics investigation, the City's failure to publicly acknowledge Finley's exoneration by the Attorney General
- the City's failure to rectify the professional harm caused by the investigation,
- and failure to rehire.

"According to Finley, this conduct occurred from August 2021 through November 2021 when he was exonerated."  (Doc. 62 at 9.)  This Court then concluded that: "Until the facts are developed further, the Court finds at this point that the failure to rehire and the alleged false claims made to the Ethics Commission, which occurred within the 180 days of filing his EEOC charge, could constitute unlawful retaliation under Title VII."  (Id.)  The facts have now been "developed further" and Finley's position is even worse.

When a plaintiff presents only circumstantial evidence of retaliation or discrimination, "this Court applies the three-part, McDonnell Douglas burden-shifting framework." Ferguson v. City of Montgomery, No. 2:22-CV-607-ECM,

2024 WL 5056616 at *14 (M.D. Ala. Dec. 10, 2024). To establish a prima facie case of retaliation under <u>McDonnell Douglas</u>, the plaintiff must "show that: (1) he engaged in protected activity; (2) his employer was aware of that activity; (3) he suffered a materially adverse action; and (4) there was a causal link between that protected activity and an adverse employment action." <u>Davis v. Postmaster Gen.</u>, 550 F. App'x 777, 779 (11th Cir. 2013) (internal quotes and citations omitted). If the plaintiff establishes a prima facie case, the burden "shifts to the employer to articulate legitimate reasons for the adverse employment action to negate the inference of retaliation." <u>Ferguson</u>, 2024 WL 5056616 at *14 (internal citation omitted). "[If] the employer offers a legitimate reason for the adverse employment action, the burden then shifts back to the plaintiff to prove by a preponderance of the evidence that the 'legitimate' reason is merely pretext for prohibited, retaliatory conduct." <u>Id.</u>

### 1.) No City actor brought false complaints against Finley to the Alabama Ethics Commission or its investigation on or after August 4, 2021.

180 days prior to Finley's filing of his EEOC Complaint was August 4, 2021. On that day, the AEC held a hearing where Finley alleged that AEC employees, Cynthia Raulston and Byron Butler, "presented false evidence" to the AEC. (Doc. 42 at ¶ 79.) And, as alleged by Finley, the AEC "concluded" that "Finley had committed an unspecified 'minor violation' of the Alabama Ethics Act." (<u>Id.</u> at ¶

80.)    Without regard to whether any of those allegations have merit, what is undisputed is that: (1) the City did not (through any agent or officer) provide any testimony to the AEC on or after August 4, 2021; (2) the City did not (through any agent or officer) give any evidence to the AEC on or after August 4, 2021; and (3) the City did not interact with anyone associated with the AEC on or after August 4, 2021.

> Instead, Finley admits:
>
> I don't have anything concrete to put these three together in terms of recruiting those officers to file a complaint, to give statements, and submit false evidence.

(Ex. 3 - Finley I Depo. pp. 219, l.3 – p. 220, l.1.)    That is, any attempt by Finley to claim that he was retaliated against because the City brought false complaints or evidence before the AEC on or after August 4, 2021, is simply wrong.[6]    There is no evidence of any allegations; Finley could only point to has allegations of City activity prior to this date, which have already been dismissed by this Court. Because the City did not engage in any activity with the AEC on or after August 4, 2021, Finley's claim is due to be dismissed.

---

[6] Not only is it wrong, the City's undisputed conduct was exactly the opposite: Stacy Bellinger, the City Attorney, advised AEC Investigator Butler that neither Finley nor Reaves had any financial gain from the change in the handgun qualification policy. (Ex. 5 – Bellinger Depo, p.185, ll.11-15.) She also told Butler that based on everything they had looked at, **it was their opinion that there were no ethics violations.**    (Id., p.184, l.15 – p.185, l.6.)

**2.)** **The City had no duty to publicly acknowledge Finley's exoneration by the Attorney General or rectify any (alleged) professional harm caused by the investigation.**

Finley alleges that in November of 2021, the Attorney General "fully exonerated Finley and cleared him of all wrongdoing."  (Doc. 42 at ¶ 86.)  Finley alleges that the City – between August 4, 2021 and his EEOC filing – "did not issue any type of press or media release" and "did not retract their initial public statements."  (Doc. 42 at ¶ 87-88.)  Finley attempts to build a Title VII retaliation claim off of these allegations.  It is undisputed that after the Attorney General's action, the City did not issue any press releases or retract its initial public statements. And it matters not because there is no duty to quell.

A public official-superior's public statements regarding his perception of another public official's job duties in response to allegations of unlawful conduct "do not rise to the level of adverse action." See Godfrey v. State, 962 N.W.2d 84, 111 (Iowa 2021) (internal citations omitted). Cf. Shotz v. City of Plantation, Fla., 344 F.3d 1161, 1165, 1180-83 (11th Cir. 2003) (releasing private citizen's personal information constituted adverse action for prima facie ADA retaliation case where, examining the "whole package" without "decid[ing] whether some parts of the information [] released may have been permissible," "the breadth of the personal information," including "criminal, credit, [] driving records, medical history, involvement in professional disciplinary and other civil proceedings, property

ownership, social relationships, including an ongoing conflict with a neighbor, [and] a criminal report involving his wife," went "beyond any legitimate bounds").

Furthermore, "the failure to issue a positive press release is not a material adverse action." Godfrey, 962 N.W.2d at 111-12 (other citations omitted) (citing AuBuchon v. Geithner, 743 F.3d 638, 645 (8th Cir. 2014)). See also Flynn v. New York State Div. of Parole, 620 F. Supp. 2d 463, 487 (S.D.N.Y. 2009) (affirming summary judgment on disparate treatment where plaintiff did "not cite, and the Court's research [did] not reveal[], any legal authority that supports [] that lying about an employee to the public or failing to defend an employee before the public constitutes an adverse employment action under Title VII"); Arnold v. City of Columbus, 515 F. App'x 524, 531 (6th Cir. 2013) (internal citation omitted) (emphasis in original) ("Nor do the negative media coverage and newspaper articles constitute adverse employment actions given that Plaintiffs do not establish that they suffered a materially adverse change in the terms or conditions of employment because of their employer's actions.").

Likewise, the failure to "adequately laud" the plaintiff's job performance amount to nothing more than "'petty slights or minor annoyances that'" are not unlawful retaliation. AuBuchon, 743 F.3d at 645 (quoting Burlington, 548 U.S. at 68, 126 S.Ct. at 2415).

Even though there is no duty to quell, there is no evidence that the City or

Mayor Reed caused any of the post-August 4, 2021, articles to be published.   (See Ex. 1 - Reed Depo., p.295, l.14 – p.297, l.1; Exs. 26 and 27.)   As to the August 4, 2021, article (Ex. 26), the City's statement is not the entire news piece. Indeed, as it relates to the AEC, the City can only be attributed with this statement: "The City of Montgomery is grateful to the Alabama Ethics Commission for its diligence in this matter."   (Ex. 26.)   It is undisputed that this article has noting to do with Finley's job performance or is any publication by the City as to Finley.   The City's position is, therefore, even stronger than in Godfrey, where the comments were critical of the public figure plaintiff's job performance in response to the alleged wrongdoing and still insufficient for an adverse employment action.   Here, the City's August 4 comments were not even critical of Finley.

The September 1, 2021, article (Ex. 27) only mentions Finley twice. First, in repeating part of one sentence of Mayor Reed's June 15 statement ((Ex. 24 (June 15, 2021, Article) at p.1) and second, referring back to the August 4, 2021, article, saying "shortly after she [Harris] assumed the role [as Interim Chief], the [AEC] found that Finley and [MPD] Chief of Operations Jennifer Reaves each committed a minor violation of the Alabama Ethics Act. The specific violations have not been made public." (Ex. 26.)   Neither of those statements are disparaging, for the reasons above, or became disparaging when repeated. Even if so, there is no evidence to suggest the City caused them to be published again.   Instead, it is undisputed that

Mayor Reed does not sanction articles by news outlets. (Ex. 1 - Reed Depo., p.295, l.14 – p.297, l.1.)

Even in this Court were to consider the "whole package" of statements, and assume the City caused them to be released, nothing about these statements were personal matters to Finley, unnecessarily overbroad, caused Finley any material injury, or "might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" See Burlington, 548 U.S. at 68 (citations and quotations omitted).

Finally, the City has no duty to issue a positive press release about Finley, and its failure to do so does not constitute an adverse employment action or unlawful retaliation. See Godfrey v. State, 962 N.W.2d 84, 111 (Iowa 2021) (internal citations omitted).    Finley cannot provide any evidence or authority of such a duty.    Because the City was not under a duty and did not issues any statements that affected Finley on or after August 4, 2021, Finley's retaliation claim is due to be dismissed.

### 3.)    Finley did not ask to be rehired.

And, last, Finley attempts to keep his Title VII retaliation claims alive by alleging that after August 4, 2021, the City "refused to reinstate Finley to his former position…[r]ather they moved to hire a permanent replacement for Finley.  (Doc. 42 at ¶ 90.)  As this Court is aware, "[a]n employer's failure to recall or rehire an employee is 'undoubtedly an adverse employment action' where the employee

reapplied for the position after termination." <u>Jones v. Alabama Power Co.</u>, 282 F. App'x 780, 785 (11th Cir. 2008). However, "[i]f the employer uses formal procedures to announce positions and identify candidates, the plaintiff cannot make out a prima facie case unless he shows that he applied for the position." <u>Id</u>. (internal citations omitted).

Even "an expression of a general interest in being rehired is not sufficient to satisfy the application requirement." <u>Id</u>. In <u>Jones</u>, the Eleventh Circuit held that because it was undisputed that the plaintiff did not reapply for any positions with the employer after termination, the plaintiff did not suffer a materially adverse employment action when the employer allegedly refused to rehire him. Even though the Plaintiff "completed an online profile at Alabama Power's website so that he could receive e-mails regarding open positions," the Court reasoned that because "[he] never applied for a particular position," the "online profile amounted to no more than an expression of a general interest in being rehired and is not sufficient to satisfy the application requirement." <u>Id</u>.

Even stronger than in Jones, notwithstanding the City's formal procedures, conducting a nationwide search to find Finley's replacement (who is, today, a white), there is no evidence that Plaintiff Finley has ever sought re-employment with the City of Montgomery, much less been denied, nor expressed any general interest in doing so. (See Ex. 22 - Hill Depo., at 225:8-13. <u>See</u> <u>also</u> Ex. 1 - Reed Depo., at

170:14:22 ("Q. Did you conduct a nationwide search for a new police chief? A. We did. Q. How many candidates applied? A. 99. How many did you interview? A. Did I interview? Q. Yes. A. At least three."); Ex. 25 - PX86 June 21, 2021 Email Announcing Interim Chief Position).   Finley cannot base his retaliation claims off of his allegation that the City failed to rehire him because never even reapplied for that position.   His Title VII claim in Count IX is due to be dismissed.

### B.  Finley's claims for retaliation based on 42 U.S.C. § 1981, brought pursuant to 42 U.S.C. § 1983 (Count IX) are due to be dismissed because

"'Claims of race discrimination and retaliation under section 1981 in the employment context are governed by the same framework as claims under Title VII of the Civil Rights Act of 1964.'" (Doc. 62 at 13 (quotation omitted)).

#### 1.)  Finley did not suffer any adverse employment actions on, after, or before August 4, 2021.

For the same reasons as above, Finley's alleged adverse employment actions occurring on or after August 4, 2021, are insufficient for his § 1981, brought through § 1983, retaliation claim.   But neither are Finley's alleged adverse employment actions occurring before August 4, 2021, actionable.

First, Finley alleges that he was ostracized by Mayor Reed beginning in September 2020. See ¶ 7, *supra* (quoting (Ex. 3 - Finley I Depo p. 62-63.) However, although time-barred under Title VII, ostracism is insufficient for an adverse

employment action. <u>Gooden v. Internal Revenue Serv.</u>, 679 F. App'x 958, 968 (11th Cir. 2017) (citation and quotation omitted) ("'ostracism and rudeness by supervisors and co-workers do not rise to the level of an adverse employment action.'")). <u>See also</u> <u>Burlington</u>, 548 U.S. at 68 (quotation and citation omitted) ("We speak of material adversity because we believe it is important to separate significant from trivial harms. Title VII [] does not set forth 'a general civility code for the American workplace.'"); <u>Gentry v. City of Russellville, Alabama</u>, 406 F. Supp. 3d 1231, 1243 (N.D. Ala. 2019) ("Plaintiff asserts that she suffered an adverse action when 'her co-workers were told not to associate with her.' ... However, ... Plaintiff does not demonstrate who told her co-workers [that and] fails to show an adverse action....").

Not only is ostracism insufficient, but Finley has no evidence that Mayor Reed or anyone else told Finley's co-workers not to associate with him. Therefore, Finley's alleged ostracism is insufficient for an adverse employment action.

Furthermore, and as stated above, although time-barred under Title VII, there is no evidence to suggest that anyone at the City—whether Mayor Reed or anyone else—had any role in putting before the AEC false charges or evidence against Finley, whether on August 4, 2021 or otherwise. <u>Compare</u> <u>Smith v. Harvey,</u> 421 F. Supp. 2d 1370, 1379-80 (S.D. Ala. 2006) with <u>Gray v. Koch Foods, Inc.</u>, 580 F. Supp. 3d 1087, 1125 (M.D. Ala. 2022). Indeed, the undisputed evidence is that Officer Webster, on <u>November 3, 2020</u> filed the AEC Complaint (Ex. 8.)

Next, Finley alleges that Mayor Reed's alleged instructions to him at the April 6 City Council Work Session were an adverse employment action.

Of course, a "plain[] attempt[] to discourage [subordinates] from characterizing their issues as race-based," showing most displeasure with someone who "'frankly stat[ed] [they] were being bullied because of their race,'" may give rise to an inference of retaliation. See Donald v. UAB Hosp. Mgmt., LLC, 2015 WL 5915323, at *7 (N.D. Ala. Oct. 9, 2015).

Completely unlike Donald, where the subordinates complained about racist bullying and the superior attempted to discourage them from characterizing their issues as race-based, there is no evidence from which a jury could infer (1) Finley objected to race discrimination, (2) Mayor Reed was ever aware Finley thought he was being discriminated against, (3) Finley so objected before Reed's awareness, or (4) that Mayor Reed's instruction that "it would blow over" was anything more than encouraging Finley to hold his rebuttal until the appropriate time.

Contrasting with Donald, consider Finley's allegation: Mayor Reed took an adverse employment action against Finley by instructing Finley to allow MPD officers (Finley's subordinates) to air their grievances against Finley and other MPD Command Staff—members of the Government (see U.S. Const. amend. I)—for bullying, retaliation, and favoritism, to the City Council—also members of the Government (Id.)—without Finley "respond[ing] in kind" "as it would blow over

and not to worry about it.'" See ¶ 74, *supra* (quoting Ex. 3 – Finley I Depo, p. 109, l. 14-16; 188, l. 14-22; 196-199).

Although that understanding of an adverse employment action would comply with Finley's understanding of a superior's "***duty to quell*** that negative discussion … about department heads" (see ¶ 70, *supra* (quoting Ex. 3 – Finley I Depo., at pp. 186-87)), it should not surprise the Court to learn that the City's research reveals no authority from any court holding that a superior's instruction to an intermediate superior to allow the intermediate's subordinates a forum in which to air their grievances to the government and to hold rebuttal until the appropriate time is an adverse employment action against the intermediate superior.

Next, Finley alleges that he was forced to resign under duress. See ¶ 77, *supra* (quoting Ex. 3 - Finley I Depo., at pp. 11-12). That is also incorrect, and his resignation was not an adverse employment action.

The Eleventh Circuit "**presume[s] that a resignation is voluntary** unless the employee points to sufficient evidence to establish that the resignation was involuntarily extracted."   Rodriguez v. City of Doral, 863 F.3d 1343, 1352-54 (11th Cir. 2017). There are two situations in which an employee's resignation may be deemed involuntary: "(1) where the employer forces the resignation by coercion or duress; or (2) where the employer obtains the resignation by deceiving or misrepresenting a material fact to the employee." Id. (quotation and quotation marks

omitted) (§ 1983 First Amendment retaliation plaintiff's involuntary resignation evidence was sufficient for adverse employment action).[7] "[U]nless" either of those two situations are present, "[a] plaintiff's resignation is not considered an adverse employment action under Title VII…." Bell v. Alabama Dep't of Hum. Res., 2017 WL 2443493, *3 (N.D. Ala. June 6, 2017) (quotation and citation, in turn, omitted).

The Eleventh Circuit has "a non-exhaustive list of five factors to guide the [coercion] analysis: '(1) whether the employee was given some alternative to resignation; (2) [] understood the nature of the choice he was given; (3) [] was given a reasonable time in which to choose; (4) [] was permitted to select the effective date of the resignation; and (5) [] had the advice of counsel.'" Gentry v. City of Russellville, Alabama, 406 F. Supp. 3d 1231, 1249-50 (N.D. Ala. 2019) (quotation

---

[7] Finley has never alleged and cannot now pivot to allege that his resignation was involuntary because the City obtained it by deceiving him or misrepresenting a material fact. Nevertheless, it would fail even if he had (he has not). A resignation was voluntary if there is no indication of misrepresentation. See Fla. Dep't of Corr., 829 F. App'x at 895. Like in Fla. Dep't of Corr., Mayor Reed did not threaten any alternative actions to Finley's resignation. Reed said, "crime is going in the wrong direction. And that was about it, if he said anything, because it was real short and sweet." See ¶ 77, supra (quoting Ex. 3 – Finley I Depo., at p.118, l.20 – p.119, l.3). Furthermore, there is no indication that Mayor Reed knew or reasonably should have known that he could not terminate Finley with or without cause. Finley agrees he was an at-will employee, serving at the pleasure of the Mayor, and the Mayor could have terminated him. See ¶ 82, supra (quoting Ex. 3 - Finley I Depo., at 224-26:13-9). Mayor Reed had good reason to believe—by both a CI investigation and independent HR investigator—that Finley had engaged in misconduct. See Ex. 19 – PX81 Thagard Complaint file, at pp. 14-16, 27.

and citation, in turn, omitted).

Regarding factor (1), "'[assessing] whether real alternatives were offered is gauged by an objective standard rather than by the employee's purely subjective evaluation; that the employee may perceive his only option to be resignation ... is irrelevant.'" Hargray v. City of Hallandale, 57 F.3d 1560, 1568 (11th Cir. 1995) (quotation and citation omitted). "[T]he other enumerated factors bear on the assessment of whether an alternative qualifies as a 'real alternative.'" Gentry, 406 F.Supp.3d at 1249-50 (quotation omitted).

"That an alternative may be 'comparably unpleasant' to termination does not, in and of itself, render [it] something less than a 'real alternative.'" Rodriguez, 863 F.3d at 1352. "'[R]esignations can be voluntary even where the only alternative … is facing possible termination for cause or criminal charges.'" Id. at 1352-53 (quotation omitted). Such "[r]esignations … are nevertheless voluntary because 'the fact remains that plaintiff *had a choice.* [Plaintiff] could **stand pat and fight**.'" Hargray, 57 F.3d at 1568 (bolded emphasis added) (quotation omitted). See also Johnson v. Fla. Dep't of Corr., 829 F. App'x 889, 895 (11th Cir. 2020) (resignation was not involuntary under coercion theory; record did not support plaintiff's argument "she had no alternative [] because she had[] been threatened with arrest," when she had only been read Miranda rights).

Like in Hargray and Fla. Dep't of Corr., Finley admitted he had alternatives,

including fighting termination, not signing his resignation, getting an injunction, appealing to the personnel board, etc. See ¶ 83, *supra* (citation and quotation omitted).

On the other hand, a comment like "easy way or the hard way" without more is insufficient to infer that the resignation was coerced. Cf. Angarita v. St. Louis Cnty., 981 F.2d 1537, 1540-43, 1544-45 (8th Cir. 1992) (not only did one interrogator tell one accused officer "'go either the easy way or the hard way,' [] either way, 'you're gone,'" but interrogations commenced under misrepresentations, involved multiple interrogators per accused, sometimes asking questions at the same time, threatens to arrest, stripping accused of guns and badges, instructing accused they "had no rights," repeatedly denying accused's' requests for an attorney, supervisor, or polygraph, denying requests for exculpatory evidence, threatening public involvement, press releases, and to contact accused's' spouses and misrepresenting going to an accused's house to disclose allegations of sexual misconduct, drugs and alcohol, and misappropriation of funds, and turning the tape recorder off a number of times, for significant portions of over five-hour-long interrogations, including, in one case, when receiving accused's resignation).

Finley does not come close to alleging the situation in Angarita. The only similarity is that Mayor Reed allegedly used the words "easy way or the hard way."

Furthermore, implicating all the factors, Finley had advance notice that the

Mayor would ask for his resignation. Immediately before the resignation meeting, Hill told Finley privately what was about to happen. See ¶ 76, *supra* (citing Ex. 22 - Hill Depo., at pp. 116 – 122, l. 21.). Not only did Finley choose to sign instead of fighting termination, but he chose to walk into the meeting and *then* chose to sign.

### 2.) Finley never engaged in a protected activity *before* any alleged adverse employment action.

Although "'Title VII protects not just "individuals who have filed formal complaints," but also those "who informally voice complaints to their superiors or who use their employers' internal grievance procedures,"'" "[t]he mention of race is critical for [a Title VII] retaliation claim because the statute requires that the plaintiff have 'opposed any practice made an unlawful employment practice by this chapter.'" Ambus v. AutoZoners, LLC, 71 F. Supp. 3d 1280, 1302 (M.D. Ala. 2014) (other quotation and quotation, in turn, omitted) (quoting 42 U.S.C. § 2000e-3(a)).

Thus, where a Title VII race discrimination retaliation plaintiff fails to "mention or report [] race discrimination specifically," that objection "does not qualify" as a statutorily protected activity for purposes of the *prima facie* case. Id. (plaintiff's reported shoving incident to HR manager failed to mention or report race discrimination specifically and so did not qualify as a statutorily protected activity). Mentioning other types of unlawful employment actions separate from the claims present before the court is similarly insufficient. See Bryant v. United States Steel

Corp., 2010 WL 11561468, *14 (N.D. Ala. June 21, 2010) ("EEOC charge allege[d] discrimination" and "retaliation" "on the basis of sex and disability only, not race," and, thus, was not a protected activity under § 1981; "[t]herefore, any retaliation against plaintiff for the filing of [the] EEOC charge is not actionable under Section 1981"); McCreight v. AuburnBank, 117 F.4th 1322, 1340 (11th Cir. 2024) ("Complaining about a hostile work environment is different from complaining about age discrimination.").

Finley's December 2020 meeting (see ¶¶22-26, *supra*), May 13, 2021 meeting with Mayor Reed (see ¶27, *supra*), conversations with Hill and Mayor Reed where he said he trusted Reaves (see Ex. 3 - Finley I Depo., at p. 128, l.5 – p. 130, l.22), and conversation with Barousse on or about January 19, 2021 (see ¶ 55, *supra* (citing Ex. 3 - Finley I Depo., at p. 130, l.23 – p. 131, l.16)), did not mention race discrimination specifically, and therefore do not qualify as protected activities.

Likewise, Finley's January 19, 2021, request for an investigation mentions only hostile work environment, and that Finley wanted to investigate Barnes—a potential racial discrimination whistleblower—for recruiting complaints against Reaves for racism (see ¶ 53, *supra*), is insufficiently specific, and, to the extent it objects to anything, objects only to hostile work environment, which Finley did not aim at his employer (i.e., the City), but at Barnes, his subordinate. See United States Steel, 2010 WL 11561468 at *14 (quotation omitted) (participating in union election

results contest was not protected activity because "participation in th[e] investigation and resulting lawsuit was against <u>the union</u>…not against [the] employer….").

The only two times Finley even alleges he objected to his employer's race discrimination was in at least one, unspecified occasion, Finley expressed to Hill that Reaves is being discriminated against because she's white (<u>see</u> Ex. 3 – Finley I Depo., at p. 129, l.19 – p.130, l.22)[8] and his January 31, 2022 EEOC charge.

Even if Finley's January 31, 2022, EEOC Charge was a protected activity, for the reasons stated herein, there is no inference Finley's alleged adverse employment actions were in retaliation for his EEOC charge. Namely, because every alleged adverse employment action occurred *before* January 31, 2022.[9] <u>See</u> <u>Webster</u>, 710 F. Supp. 3d at 1126 ("Webster cannot claim that he was retaliated against for a conversation that occurred after his discipline…").

---

[8] Although an immaterial factual dispute, Hill (WM) testified he does not recall Bill Barousse telling him that there was a race component to the complaints being filed against Reaves. Ex. 22 - Hill Depo., at p. 199, l.18 – p. 200, l.21. Hill further testified that, although he had a conversation with Finley about the number of complaints being filed, but did not recall it being about the number of complaints filed against Reaves specifically, only the number of complaints, that he did not remember hearing "anything like" Finley telling him about his conversation with Johnson, or that Johnson told Finley that Johnson had heard female officers were going to be filing complaints against Reaves to get her fired, that he never discussed with Johnson any investigation being conducted by CI regarding complaints being filed against Reaves, and Finley never shared with him the letter he received from Johnson. Ex. 22 - Hill Depo., at p. 203, l.4 – p. 204, l.23.

[9] Including the failure to rehire/rectify the professional harm. i.e., post-exoneration, pre-EEOC charge, the City did not rehire Finley or release any statements.

Likewise, regarding the verbal complaint to Hill, although allegedly more specific, there is no evidence to suggest when this conversation took place, that Mayor Reed had any knowledge of it before any alleged adverse employment action occurred, or that it was the but-for cause of any alleged adverse employment action.

### 3.) Finley has no evidence Mayor Reed ever knew about any alleged protected activity.

To establish a causal connection between the protected activity and the adverse employment action, it is "common sense" that "the plaintiff must generally show that the decision maker was aware of the protected conduct at the time of the adverse employment action." Brungart v. BellSouth Telecomms., Inc., 231 F.3d 791, 799 (11th Cir. 2000). "A decision maker cannot have been motivated to retaliate by something unknown to him." Id. "[A]ctual, not constructive knowledge is required …." Mohammed v. GHX Glob. Healthcare Exch. Inc., , 2022 WL 1615925, *3 (11th Cir. May 23, 2022).

Finley cannot point to one instance where Mayor Reed was aware that Finley was allegedly objecting to racial discrimination, whether against Finley or someone else, by the City and/or Mayor Reed at the time when Mayor Reed took any alleged adverse employment action against Finley.

Even regarding Finley's alleged verbal objection to Hill, we could only infer Mayor Reed's constructive, as opposed to actual knowledge, and still, no evidence

to infer Mayor Reed's knowledge *before* any alleged adverse employment action.

### 4.)    Finley's evidence of temporal proximity alone is insufficient for causation.

"Close temporal proximity between the employee's protected conduct and the adverse employment action" can be "sufficient to overcome summary judgment" only "when the person who took the adverse action is aware of the predicate protected conduct." Gray, 580 F. Supp. 3d at 1125 (quotation omitted).

"[W]here there is unrebutted evidence that the decision maker did not [know] that the employee engaged in protected conduct," "temporal proximity alone is insufficient to create a genuine issue of fact as to causa[tion]." Brungart, 231 F.3d at 799. In which case, even two days between a complaint and an adverse employment action "is not enough" for causation. McCreight, 117 F.4th at 1340 (citation omitted). As stated above, Finley has no evidence that Mayor Reed knew about any alleged adverse employment actions.

Even if there is knowledge, "temporal proximity [alone] must be 'very close'" to support an inference of causation. Gray, 580 F. Supp. 3d at 1125 (quotation omitted) (sufficient temporal proximity where less than three weeks after EEOC charge, and after supervisor learned about EEOC charge, and after employee resigned, supervisors filed complaint about employee with board of nursing post-resignation, which employee claimed was fabricated). "[E]ven when the disparity is

only two weeks," it "is 'probably insufficient to establish pretext by itself.'" Johnson

v. Miami-Dade Cnty., 948 F.3d 1318, 1328 (11th Cir. 2020) (quotation omitted).

Assuming all of Finley's alleged adverse employment actions are timely and

actionable (not all of them are timely under Title VII,[10] and none of them are adverse

employment actions), the shortest temporal disparity between an alleged protected

activity for which Finley alleges a date[11] and an alleged adverse employment action

is nearly four weeks (26 days) between Finley's May 13 conversation with Reed and

---

[10] Because the Title VII claim before the Court includes only those alleged adverse employment actions occurring on or after August 4, 2021, the closest temporal proximity between an alleged protected activity (for which there is a date) and an alleged adverse employment action is the nearly 12 weeks (83 days) between the May 13 conversation with Reed and the August 4, 2021, AEC Hearing. See Johnson, 948 F.3d at 1328 (citations omitted) ("A three-to-four month disparity … is insufficient to establish pretext….").

[11] The analysis should be limited only to those events for which there is a date. See Milton v. Gray Media Grp., Inc., 635 F. Supp. 3d 1215, 1227 (N.D. Ala. 2022) ("stray remark[s]" and "comments made … on unknown dates … did not contribute to intolerable working conditions."). Should the Court choose to consider Finley's alleged protected activities for which there is not a date, the only alleged protected activity that could possibly have occurred after May 13, 2021, and before August 4, 2021, are Finley's conversion with Hill and/or Reed that he trusted Reaves, his conversation with Barousse on or about January 19, 2021, and his conversations with Hill, all of which had to occur before Finley's June 8, 2021, separation. However, there is no evidence to suggest those were protected activities (except perhaps the one unspecified occasion with Chip Hill) or that any of them occurred after, and not before, May 13. Furthermore, for any protected activity which Finley alleges without a date, not only is there is no evidence to suggest Mayor Reed was aware of any protected activities before August 4, 2021, but the jury would need to impermissibly stack their inferences to find in Finley's favor: first, inferring when the protected activity occurred, and, from the inference that it occurred within a sufficient time, further infer that the proximity was sufficient for causation, to then infer retaliation.

June 8, 2021, as to the June 8, 2021, Article, and Finley's resignation.

Twenty-six (26) days, on its own, is insufficient to show causation.

Even stronger, unlike in Gray, where the report to the board of nursing came three weeks *after* the protected activity and after the supervisor knew of the protected activity, Finley has no evidence that Mayor Reed ever knew about any alleged protected activity before any adverse employment action, and, even if he did, Webster filed his complaint on November 3, 2020, over six months before Finley's May 13 conversation with Reed. [12]

Furthermore, "when an employer contemplates an adverse actions before an employee engages in protected activity, temporal proximity between the protected activity and the subsequent adverse employment action does not suffice to show causation." Osman v. Alabama State Univ., 670 F. Supp. 3d 1298, 1325 (M.D. Ala. 2023) (quotation omitted). And the "discovery of misconduct … fatally undermines

---

[12] Although Finley alleges that he received AEC's charges one week after his May 13 conversation with Reed (see ¶ 27, *supra*), the temporal proximity between those events is not at issue. First, neither Mayor Reed nor the City gave Finley the May 20, 2021, letter. There is no evidence to suggest Mayor Reed or the City were aware Finley would receive the May 20, 2021, letter. Second, the AEC investigation began with a November 3, 2020, complaint, over six (6) months before the May 13 conversation and nearly seven (7) months before Finley received the May 20, 2021, letter. By May 2021, Butler and Raulston's investigation was well underway, having interviewed witnesses and received documents from the City, with no evidence to suggest that the City did not provide the complete documents or that Mayor Reed was involved. And no evidence to suggest that the May 13 conversation was Finley engaging in any statutorily protected activity whatsoever.

the probative value of temporal proximity between [an employee's] protected activity and her termination." <u>Berry</u>, 84 F.4th at 1312.

Importantly, fourteen (14) days before the May 13, 2021, conversation, Mayor Reed confirmed through an independent HR investigator, which concurred with a CI investigation, that Finley had violated the City's antiretaliation and protected communications policies. Thus, even if twenty-six (26) days were sufficiently close, Finley has no evidence to counter that Mayor Reed had already decided to ask for Finley's resignation *before* Finley approached him on May 13 about going to the DA to prosecute the off-duty work officers.

Therefore, for all these reasons, Finley may not rely on temporal proximity between any alleged protected activity and any alleged adverse employment action for an inference of causation to survive summary judgment.

### 5.) The City's legitimate, non-discriminatory reasons for any alleged adverse employment action.

Only if Finley could establish a prima facie case (he cannot) would the burden shift to the City. <u>See</u> <u>Berry</u>, 84 F.4th at 1307 (quotation omitted).[13] Even assuming Finley could make out a prima facie Title VII or § 1981 (brought under § 1983)

---

[13] However, the employer's "is a burden of production, not of persuasion, meaning that the employer need not persuade the court that it was actually motivated by the proffered reason." <u>Summers v. City of Dothan, Ala.</u>, 757 F. Supp. 2d 1184, 1209 (M.D. Ala. 2010), *aff'd*, 444 F. App'x 346 (11th Cir. 2011) (other citation omitted).

retaliation case (he cannot), Mayor Reed and the City have legitimate, non-retaliatory reasons for the challenged adverse employment actions, which Finley cannot produce a preponderance of the evidence to rebut as a pretext.

An "employer's stated reason is legitimate...if it might motivate a reasonable employer to act." Berry, 84 F.4th at 1307-08 (citation omitted). For instance, "[c]oncluding that "'removing [the employee] from the work environment would improve morale and reduce turnover'" based on evidence from an independent evaluator, even in light of the allegation that employees are "'targeting'" the Plaintiff, is a "reason [that] might legitimately motivate a reasonable employer to terminate an employee." Id. at 1308 (citations omitted).

Like in Berry, as stated above, Mayor Reed's reasons for not rehiring Finley are the same as those for separating Finley on June 8, 2021: improving morale and getting crime under control. See ¶¶77, 80, 81, supra (citations omitted).

The same is true for any alleged ostracism: Mayor Reed and Finley agree Mayor Reed was dissatisfied with Finley's performance. See ¶77, supra. See also Ex. 1 - Reed Depo., at p. 155, l.5 – p. 156, l. 1.

Mayor Reed's proffered reasons in asking Finley not to "respond in kind" were that "it would blow over and not to worry about it." See ¶ 74, supra.

Regarding the articles, Mayor Reed, Harris, and the City's justifications were government transparency (see Ex. 1 - Reed Depo., at p. 290, l.15 – p.291, l.15; p.297,

l.22 – p.298, l.23), improving morale (see Ex. 28 - Harris Depo., at p.186, l.20 –
p.187, l.19), and saying as little as possible without saying nothing (see Ex. 1 – Reed
Depo., at p. 157, l.18 – p.158, l.5). Regarding the lack of any further articles, as
stated above, the City was under no duty to do so, and in the case needing to regain
public trust, declining to present further uncertainty might well motivate a
reasonable employer *not* to act.

As for the August 4, 2021 AEC Hearing, to the extent anyone from the City
gave a statement at that hearing, or otherwise participated in AEC's investigation
before August 4, 2021, they were complying with the investigation in accordance
with the AEC's authority. See Ala. Code §36-25-4(h). Beyond that, there is "simply
no evidence that false or misleading statements were made by any" employee of the
City before, during, or after the AEC Hearing (see Harvey, *supra*, 421 F. Supp. 2d
at 1379-80), and no evidence that even if they did, they did so because of Finley's
race or engagement in any race-based protected activity.

These are each legitimate reasons which might motivate a reasonable
employer to act, and which, although he will try, Finley cannot rebut as pretext.

### 6.) Even beyond McDonnell-Douglas, Finley cannot present his circumstantial evidence in any other way to create an inference of retaliation.

"Without relying on the McDonnell Douglas framework, an employee may
prove retaliation with any circumstantial evidence that creates a reasonable inference

of retaliatory intent." <u>Berry</u>, 84 F.4th at 1310. However, although "[t]he court must view the evidence in the light most favorable to the employee and draw all reasonable inferences in her favor, … 'inferences in favor of [an employee] can be based only on evidence—not on speculation.'" <u>Id.</u> at 1311 (citation and quotation omitted). "When an employer offers 'abundant and uncontroverted independent evidence' that no retaliation occurred, the employer will be awarded summary judgment." <u>Id.</u> (quotation omitted).

Finley is far from a convincing mosaic of intentional race discrimination or employment retaliation. Between when Reed's swearing-in as Mayor and Finley's separation from the City, violent crime in Montgomery went through the roof, and morale went through the floor. Finley knew from the beginning of Reed's Administration—heard it from Reed himself—that Mayor Reed's priority was homicides. And yet, weekly update after weekly update, 2:00 a.m. call after 2:00 a.m. call (<u>see</u> Ex. 3 - Finley I Depo., p. 63, ll.2-13), Finley was the one to let Reed know that Reed's priority was becoming one of the City's most prominent stains. By the time of Finley's separation, homicide rates were at an all-time high. And Mayor Reed's constituents want him to "get crime under control." <u>See</u> ¶ 5, *supra* (citing Ex. 1 - Reed Depo., p.230, ll.5-13.)

Not only were Mayor Reed's priorities tossed aside, but all the while, police department morale was at perhaps an all-time low. Reed learns Finley retaliated and

interfered with protected communications of an officer wanting to meet with Reed, which an outside HR consultant confirmed after CI substantiated the charges. See ¶¶ 59-62, *supra* (citations omitted). All the while, Finley is requesting an investigation into Barnes—a potential discrimination whistleblower—based on a tip from a confidential informant that *didn't talk to Finley*. See ¶¶ 53-56, *supra* (citations omitted). That's right—not only using confidential information but requesting an investigation into someone alleging racial discrimination by one of Finley's command staff.

Entirely too many 2:00 a.m. calls later, MPD officers and other members of the public finally find their way on the City Council agenda, which Mayor Reed does not control, to voice their complaints—not in an adjudicatory setting, but simply a public forum, where they are given only five minutes each (extended from three). Each of them has specific allegations about the MPD, with the common denominator being that if you complain about MPD command staff, including Finley, you will be retaliated against. See https://www.youtube.com/watch?v=0pjahvrGU7k. Finley alleges it was Mayor Reed's duty to silence the officers, and, instead, Reed silenced Finley, optimistically advising him not to say anything "as it would blow over."

Their complaints include miscommunications (to say the least) about which policies are in effect at any given time. That's right—questions about which policies are in effect at any given time. Although Mayor Reed had no idea about this then,

the firearms and off-duty work policies were screaming out from the evidence. On one occasion, Finley punished black officers who, although they had not violated the express language of the policy, had gone out of bounds of the implied policy under which the City had operated. Within a few days, Finley changed that policy to be more expressly clear but nevertheless punished those officers. See Webster, 710 F.Supp.3d at 1121. He and Mayor Reed disagreed about the level of punishment to impose. But, without any objection, Finley issued the sentence according to Mayor Reed's wishes. See ¶¶25-26, *supra* (citations omitted). Yet, on another occasion, Finley changed the policy in the field while also asking that it not be advertised (see ¶¶39-45, *supra* (citations omitted)) and apparently to benefit all employees, but which also benefitted Reaves (WF) and Finley's son, which Finley (and Reaves) explain was merely a coincidence. In that case, Finley had to be instructed (not by the Mayor) to impose the punishment under the policy for those officers who failed to qualify. There is no evidence of Mayor Reed's involvement in that fiasco whatsoever.

Eventually, Mayor Reed's optimism runs out, and he has had enough. Finley has put the City's safety to the side, put morale in the trash bin, and made Reed look bad long enough. Although Finley understood he was an at will employee and that Reed could have terminated him, and if he had, Finley could have fought the employment decision, Reed asked for Finley's resignation. See ¶¶75-82, *supra*

(citations omitted). With the support and information sufficient to terminate Finley for cause, Reed says, "we can do this the easy way or the hard way." Finley says that was coercion but admits that instead of fighting it, refusing to sign, or being terminated for cause, Finley resigned. See ¶83, *supra*.

Now, Finley comes to Court accusing Mayor Reed of discriminating against and retaliating against Finley—refusing to reinstate him, even—because he refused to give preferential treatment based on race. Most tellingly, Finley can present no protected activity where he objected to such employment practices, much less before any adverse employment action was taken against him. He cannot even show any adverse employment actions or any inference that the two are not wholly unrelated.

For all these reasons, this case is devoid of evidence to support any inferences necessary for Finley's retaliation claims to survive this Motion, much less to present a "convincing mosaic" through circumstantial evidence.

**C.    Finley's claim of race discrimination under 42 U.S.C. § 1981, brought pursuant to 42 U.S.C. § 1983 (Count VI) is due to be dismissed because Finley cannot show that Mayor Reed was the final**

When a plaintiff uses "§ 1983 [] as 'a parallel remedy' to Title VII, the elements of the two causes of action are the same." Riley v. Birmingham Bd. of Educ., 154 F. App'x 114, 118 (11th Cir. 2005) (citations and quotations omitted). See also Johnson, 948 F.3d at 1325 (citations omitted) ("…identical methods of

proof, such as the <u>McDonnell Douglas</u> framework, are used for both …"). For the same reasons that Finley's Title VII Claims fail, as laid out above, his 42 U.S.C. § 1981, brought pursuant to § 1983, race discrimination claim also fails.   Even if they are not parallel remedies, Finley's race discrimination claim(s) are due to be disposed of.

### 1.)    Mayor Reed did not sabotage Finley's meaningful administrative review.

First, for purposes of municipal liability, Finley's only hope going into discovery was theory [3] of § 1983 municipal liability: "[o]nly those municipal officials who have final policymaking authority may by their actions subject the government to § 1983 liability."   <u>City of St. Louis v. Praprotnik</u>, 108 S. Ct. 915, 924 (1988) (internal quotation omitted in original); <u>see also</u> Doc. 44 at 10.[14]

---

[14] There has been no evidence of any express policy of racial discrimination. In fact, there is an express policy *against* racial discrimination, which Mayor Reed approved. <u>See</u> ¶63, *supra* (citing Ex. 1 - Reed Depo., at p.88, l.8 – p.89, l.9 (citing, in turn, Ex. 20 – City Handbook, at p. 32). <u>See also</u> Ex. 20 – City Handbook at pp.i, 32-41. Nor has there been any evidence of any alleged discriminatory practice—i.e., punishing blacks who punish blacks or punishing blacks who promote whites, as Finley alleges—so "'sufficiently widespread so as to put [the defendants] on notice of the need to act.'" <u>See</u> (Doc. 44, pp.8-10). Mayor Reed has himself terminated (despite a recommendation of lesser punishment) several of the black officers that Finley alleges were part of Reed's conspiracy against Finley (<u>see</u> <u>Ferguson</u>, 2024 WL 5056616 at *10) and affirmed Reaves' (WF) recommended punishment of another officer (<u>see</u> <u>Webster</u>, 710 F.Supp.3d at 1126), Mayor Reed approved Finley's promotion of Reaves to Deputy Chief (<u>see</u> ¶¶8,12, *supra* (citations omitted)) and, after Finley's separation, has approved the promotion of two whites to Deputy Chief, Interim Chief, and Police Chief. <u>See</u> Ex. 1 - Reed Depo., at p. 15, ll.21-23 (At

However, we know now—based on the undisputed facts—that the City Council meeting was not a review of Finley's separation from the City, and the Mayor's decision to separate Finley would have been subject to meaningful administrative review but for Finley's failure to invoke those processes.

First, the "following Reed's alleged false complaints against Finley" portion of Finley's allegation has proven to be without an evidentiary basis. There is no evidence, and Finley cannot reasonably draw any inference, that Mayor Reed was involved in filing any complaints against Chief Finley, whether to CI, the AEC, or anyone else.

Second, the City cannot overstate that the April 6 City Council Work Session occurred nearly two months *before Finley's separation* from the City.

Third, although it would be impossible in the chronology, the City Council meeting was ***not*** a forum where Finley was to challenge his separation from the City. Nor was the City Council sitting in any adjudicatory capacity hearing the MPD officers' grievances. In fact, the Chairman stated at one point, indicating for the officers to hurry up, "[w]e are not the judge." See time 22:10-22:40, 1:02:09-1:02:16 at  https://www.youtube.com/watch?v=0pjahvrGU7k.  The  officers  were  there

_____

the time of Reed's deposition, Jim Graboys was interim Chief); at p. 260, ll.16-20 (John Hall was a deputy chief); Ex. 22 - Hill Depo., at p.39, l.17 – p.40, l.4 (After Chief Albert, John Hall became acting Chief, replaced by Interim Graboys, and then Permanent Graboys).

merely as members of the public. Thus, whatever Mayor Reed told Finley at the City Council meeting, it could ___**not**___ possibly have been sabotaging Finley's meaningful administrative review of Reed's decision to separate Finley from the City or of the officers' grievances against the Command Staff.

What is more—and why Finley's race discrimination claim *cannot* succeed—Finley could have appealed his separation from the City and chose not to.

As this Court correctly stated, "[i]n the Eleventh Circuit, the courts have 'recognized and given effect to the principle that a municipal official does not have final policymaking authority over a particular subject matter when that official's decision[s] are subject to meaningful administrative review.'" (Doc. 62 at p. 16 (quotation and citation, in turn, omitted)).

As stated above, Finley admitted he had alternatives besides resigning or being terminated, and those included "an appeal to the city council and the personnel board to keep my job and to make it difficult for him to fire me on the spot without due cause." See ¶ 83, *supra* (citations and quotations omitted ("Q. And is the mayor the only person who has the authority to hire, fire or discipline the chief of police? MS. HAYNES: Object to form. A. Correct. Q. Okay. And would that be the same for the interim police chief? A. Correct. Q. And so as chief you don't have any right to appeal to the personnel board? A. Yes, I do. Q. You do? A. (Witness nods head.) Q. What actions? A. I think it's - - Let's see. It's part of the due process. I think - - I

don't have it offhand, but it's in the Alabama Code that police chiefs or certified officers have that right to due process, has the right to appeal. I don't have it offhand.")). Yet, there is no evidence that Finley appealed his separation.

Unlike in Willingham v. City of Valparaiso Florida, 638 Fed. Appx. 903, 907 (11th Cir. 2016), where the mayor who terminated the plaintiff was chairman of the City Commission, to which the plaintiff appealed the mayor's decision, Mayor Reed is not a personnel board member and is statutorily barred from the board. See Ex. 1 - Reed Depo., at p.92, l.18 – p.93, l.1. See also Ala. Code § 45-51A-32.186 ("(b) …A member may not be a city employee or board member or a blood relative, as defined by the state Merit System, of a city employee or the mayor or a city council member."). See also Ala. Code § 45-51A-32.110 (2023) ("…No person shall be appointed to the board who holds any salaried public office or employment, nor shall any member, while a member of the board or for a period of one year after he or she has ceased for any reason to be a member, be eligible for appointment to any salaried office or employment in the service of the county or municipality or any county or municipal elective office.").

Neither can Plaintiff Finley now respond that the personnel board's decision would have been a "rubber stamp" of Mayor Reed's decision to separate Finley from the City. A plaintiff's "fail[ure] to seek an override" of a city official's decision or "trigger" the reviewing body's "authority" forecloses the "conten[tion] that the

[reviewing body] would have deferred to [the official's] judgment on all … issues…." Manor Healthcare Corp. v. Lomelo, 929 F.2d 633, 638 (11th Cir. 1991).

Thus, not only is there no evidence to connect a constitutional injury to any adverse employment action taken against Finley, but, even if there were, there is no theory upon which a reasonable trier of fact could hold the City liable.

### 2.)    Finley was not constructively discharged.

A "Plaintiff's decision to voluntarily resign in the face of a possible termination is not a constructive discharge." Jones v. Allstate Ins. Co., 707 F.App'x. 641, 646 (11th Cir. 2017). "Constructive discharge occurs when an employer deliberately makes an employee's working conditions intolerable and thereby forces him to quit his job." Bryant v. Jones, 575 F.3d 1281, 1298 (11th Cir. 2009) (internal citations and quotations omitted). "[T]he employee must demonstrate that her employer deliberately made working conditions intolerable, thereby forcing her to quit her job." Mohammed, 2022 WL 1615925 at *3 (citation omitted).

A constructive discharge is something like "shocking evidence of an overt and unabashed pattern of discrimination," including "abus[e] to [the plaintiff] on numerous occasions, including an interaction where [defendant/supervisor] appeared ready to assault [plaintiff] physically," "refus[ing] to hire a white candidate, to [another superior's] condescending and racially charged comments that [plaintiff] couldn't relate to black men or that she was too ignorant or idealistic to

understand racial politics in [the jurisdiction], it was clear that [plaintiff] was not welcome to continue working for [the] County on account of her being white, and a reasonable person in her position would have had no choice but to resign." Bryant, 575 F.3d at 1299.

Completely unlike in Bryant, Finley cannot point to a single instance of abuse. There is no shocking evidence or pattern of discrimination against Finley. Mayor Reed has never refused to hire white candidates—he approved the promotion of Reaves, and, since Finley's separation, has promoted two whites to MPD Chief, including the current, permanent Chief. See n.14, *supra* (citing ¶¶8,12, *supra* (citations omitted); Ex. 1 - Reed Depo., at p. 15, ll.21-23, at p. 260, ll.16-20; Ex. 22 - Hill Depo., at p.39, l.17 – p.40, l.4)). Mayor Reed never made any racially condescending comments to Finley. See ¶¶13-14, *supra* (citations omitted). The only evidence that Finley was "constructively discharged" is his conclusory allegation that he was constructively discharged, which is insufficient to survive summary judgment.

Even if Finley could produce such evidence (he cannot), "'[a]n employer may defend against [a constructive discharge claim] by showing both (1) that it had installed a readily accessible and effective policy for reporting and resolving complaints of [discrimination], and (2) that the plaintiff unreasonably failed to avail herself of that employer-provided preventive or remedial apparatus.'" Bryant, 575

F.3d at 1299 (quotation omitted).

The City has anti-discrimination, harassment, and retaliation policies. See ¶ 63, *supra* (citing (Ex. 1 - Reed Depo. p. 88, l. 8 – p. 89, l. 9; Ex. 20 - City Handbook p. 32-41.). The City also had several complaint mechanisms which Finley took advantage of on at least one occasion, asking for an investigation into Barnes—a potential race discrimination whistleblower. See ¶53, *supra* (citations omitted).

Although a "defendant cannot avail himself of this defense, however, 'if the plaintiff quits in reasonable response to an employer-sanctioned adverse action officially changing her employment status or situation, for example, a humiliating demotion, extreme cut in pay, or transfer to a position in which she would face unbearable working conditions,'" Bryant, 575 F.3d at 1299 (quotation omitted), Finley did not quit, and he did not resign in response to an adverse employment action changing his employment status. As Finley admits, he could have fought the charges, and, by fighting the charges, he specified that he meant exercising his right to appeal his termination. See ¶ 83, *supra* (citation omitted).

### 3.) Finley was not forced to resign.

To the extent Finley also brings a race discrimination claim alleging forced resignation, for the same reasons as stated above, Finley's resignation was voluntary. There is not even an inference that Finley's resignation was involuntary or connected to racial discrimination whatsoever. Thus, to the extent it is based on an alleged

forced resignation, Finley's § 1981, brough through § 1983, racial discrimination claim is due to be disposed of.

**D.** **"I don't have anything concrete to put these three together in terms of recruiting those officers to file a complaint, to give statements, and submit false evidence"[15]: Finley's Conspiracy Claims (Counts X and XI) are due to be dismissed as Finley has no evidence of an agreement, no evidence that anyone with the City conspired with anyone outside the City, and cannot prove any substantive wrong-doing, for any claim.**

As to Finley's Conspiracy claims, this Court has held that "[a]t this stage in the litigation the Court must assume that Butler and Raulston conspired with Reed and thus finds that the intracorporate conspiracy doctrine does not bar the conspiracy claims." (Doc. 62 at 21.) Discovery has now ended and despite Finley's numerous allegations to create a conspiracy, his Amended Complaint is merely "string [ing] together" adverse acts of individuals." Hein v. Kimbrough, 942 F. Supp. 2d 1308, 1313 (N.D. Ga.) (holding merely "string [ing] together" adverse acts of individuals is insufficient to demonstrate the existence of a conspiracy) *aff'd*, 545 F. App'x 926 (11th Cir. 2013) (citing Harvey v. Harvey, 949 F.2d 1127, 1133 (11th Cir.1992)). Finley has not specified which of his broad and often vague assertions underpin or even relate to his conspiracy claims. And to the extent Finley's conspiracy could have a defined scope, it remains difficult to ascertain.

---

[15] Ex. 3 - Finley I Depo. pp. 219, l.3 – p. 220, l.1.

Nevertheless, here's what we do know – the undisputed facts:   On November 3, 2020, Marcus Webster filed a Complaint with the AEC against Finley and Deputy Chief Reaves (plaintiff in 2:22-cv-00458-ECM-KFP, in this Court):



(Ex. 8.)   As of this date, **<u>absolutely nothing</u>** by way of any Finley's allegations had occurred.   That is, Finley had not (allegedly) engaged in any protected activity that he now alleges as the foundation of his conspiracy: defending the hiring of Jennifer Reaves; opposing any discrimination; making any protected speech, engaging in any protected activity – nothing.   Officer Marcus Webster filed this Complaint because upset with Finley's off-the-cuff firearm policy change that he perceived benefitted Jennifer Reaves.   (Ex. 8 at p.2 – "Statement of Facts".)   There is no evidence, no allegations, no inferences of any wrongdoing related to the AEC's receipt of this Complaint and its – finally getting around to addressing the Complaint – when it notified Finley of the filing in May of 2021 (Ex. 7.)

Cynthia Raulston and Byron Butler are employees of the Alabama Ethics Commission.   Even assuming Finley's allegations that the AEC found Finley in violation of a minor Ethics violation related to Finley's mis-handling with the

October 2020, MPD firearms qualification, and that after this finding, the Attorney General exonerated Finley, (See Doc. 42 at ¶ 87), Finley cannot connect any City actor with the AEC's handling of the Complaint – because the AEC already had the Complaint.

Further, it is undisputed that Officer Webster did not speak with anyone with the Alabama Ethics Commission ("AEC") before filing his complaint on November 3, 2020. (Ex. 6 - Webster Depo., p.80, l.6 – p.81, l.3.)   Mayor Reed did not know anything about the Ethics Complaint, filed by Webster, against Finley:

```
12      Q.  Do you know what the ethics
13          complaint was about?
14      A.  No. Well, now I know. We've got
15          to get ready for this deposition. So I know
16          now, but I didn't know at the time.
```

(Ex. 1 – Reed Depo at p. 213, l.12-16.)

Mayor Reed never talked to anyone at the Ethics Commission about Jennifer Reaves; he never partnered with AEC Investigator Butler on anything; and he was not aware that MPD Marcus Webster was the person who complained or filed the ethics complaint against Finley and Reaves. (Ex. 1 - Reed Depo., p.196, l.8 – p.197, l.8; p.209, ll.16-19; p.212, ll.3-6.)

As important, after the AEC began handling the Ethics Complaint the City defended Finley.   City Attorney, Stacy Bellinger, who handled matters involving the AEC as part of her official job duties (Ex. 5 - Bellinger Depo., p.22, ll.17-19),

upon realizing there were multiple policies on firearms, poke with AEC's investigator, Byron Butler, and advised him that there were policies that should have been archived but were not. (Id., p.182, l.17 – p.183, l.18.)

Bellinger is the one who initiated the fact that there were multiple policies on handgun qualification with Butler. (Id., p.195, ll.11-15.) She wanted to be clear "about the confusion at MPD and why a policy that wasn't in effect was produced and what we were producing." (Id.) When she forwarded the letter to the AEC about the policy change, she also sent the policies. (Id., p.197, ll.6-9.) **Bellinger advised AEC Investigator Butler that neither Finley nor Reaves had any financial gain from the change in the handgun qualification policy. (Id. p.185, ll.11-15.) She also told Butler that based on everything they had looked at, it was their opinion that there were no ethics violations. (Id., p.184, l.15 – p.185, l.6.)**. As admitted by Finley, Bellinger provided fair and correct information to the Ethics Commission. (Ex. 3 – Finley I Depo., p.89, l.20 – p. 90, l.3.)

For Finley to sustain his Conspiracy claims in Counts X and XI, to survive a motion for summary judgment, "[a] mere 'scintilla' of evidence ... will not suffice; there must be enough of a showing that the jury could reasonably find for that party." Rowe v. City of Fort Lauderdale, 279 F.3d 1271, 1284 (11th Cir. 2002). At the claim's most fundamental level, Finley must show an agreement between "two or more persons" to deprive him of his civil rights. Dickerson v. Alachua County

Comm'n, 200 F.3d 761, 767 (11th Cir. 2000).

There is no evidence at all of any "agreement" between the City and Raulston and/or Butler. See note 6, *supra*. To the contrary, the undisputed facts show that aggrieved Officer Webster filed the AEC Complaint **before** any of Finley's allegations occurred and that once the investigation began, the City informed the AEC that it **did not** believe that any ethics violations had occurred. Finley has no basis to allege that any of the City conspired with AEC. Finley's allegations are vague and supported by mere guesswork as to the make-up of a conspiracy and to what end the conspirators plotted.

Finley has no evidence that the Mayor forwarded false and fraudulent information to the Ethics Commission. (Ex. 2 – Finley II Depo., p.454, l.17 – p.457, l.12.) He has no evidence that Reed conspired with Butler and/or Cynthia Raulston, AEC General Counsel, to manipulate evidence. (Id., p.457, l.13 – p.458, l.16.) Most importantly, Finley admits:

> I don't have anything concrete to put these three together
> in terms of recruiting those officers to file a complaint, to
> give statements, and submit false evidence.

(Ex. 3 - Finley I Depo. pp. 219, l.3 – p. 220, l.1.) Finley's Counts X and XI are due to be dismissed.

Finally, as shown above, Finley's underlying substantive claims are without merit. Even if the court were to find some connection between agents of the city

and employees of the State, Finley still fails to prove that these employees conspired and took and took intentional actions in furtherance of a conspiracy. "Having concluded that Plaintiffs' substantive claims fail on the merits, their conspiracy claim fails as well because Plaintiffs would not have been "deprived of any rights or privilege" by the Defendants' allegedly wrongful acts".   Denney v. City of Albany, 247 F.3d 1172, 1190 (11th Cir. 2001) (citations omitted).

*Aside: Finley's Intracorporate Conspiracy Theories*

Finley's Amended Complaint is replete with allegations of officers conspiring together to remove Finley from office.   To be sure, his entire City Council Work Session allegation is such an example.   As this Court is aware, the City filed a Motion to Dismiss Counts X and XI because these conspiracy theories violated the intracorporate ban.[16]  This Court held "[a]t this stage in the litigation the Court must assume that Butler and Raulston conspired with Reed and thus finds that the intracorporate conspiracy doctrine does not bar the conspiracy claims."   (Doc. 62 at 21.)   That is, Counts X and XI are only viable as to Finley's allegations of

---

[16] "The doctrine applies to public entities such as the City and its personnel." Denny v. City of Albany, 247 F.3d 1172, 1190-91 (11th Cir. 2001), citing Dickerson v. Alachua County Comm'n, 200 F.3d 761, 768 (11th Cir. 2000) (rejecting employee's § 1985(3) claim on that basis where employee alleged civil conspiracy among solely County employees); Chambliss v. Foote, 562 F.2d 1015 (5th Cir.1977), aff'g, 421 F.Supp. 12, 15 (E.D.La.1976) (applying intracorporate conspiracy doctrine to shield the public university from § 1985(3) liability in a civil conspiracy claim).

conspiracy between the City and Raulston/Butler.    Any allegations by Finley, in his opposition brief related to any other City employees, violate the intracorporate ban and have been/are due to be dismissed.    <u>Denny v. City of Albany</u>, 247 F.3d 1172, 1190-91 (11th Cir. 2001).

**/s/ Scott M. Speagle**

SCOTT M. SPEAGLE (SPE 050)
WALKER N. KOWALCHYK (KOW004)
ALEX L. SANDLIN (SAN 099)
Attorneys for the City of Montgomery, Alabama

OF COUNSEL:

WEBSTER, HENRY, BRADWELL, COHAN
  SPEAGLE & DESHAZO, P.C.
Post Office Box 239
Montgomery, Alabama 36101
Telephone:  (334) 264-9472
Facsimile:  (334) 264-9599
Email:      scott@websterhenry.com
            wkowalchyk@websterhenry.com
            alex@websterhenry.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing has been served on the following by directing same to counsel's office address via United States first class mail, postage prepaid, or by electronically filing the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing on this 12th day of March, 2025:

Heather Leonard, Esq.
HEATHER LEONARD, PC
2105 Devereux Circle; Suite 111
Birmingham, Alabama 35242

Alicia Kay Haynes, Esq.
HAYNES & HAYNES
1600 Woodmere Drive
Birmingham, Alabama 35226

Terry G. Davis, Esq.
Ronald B. Hatcher, Esq.
DAVIS HATCHER LAW, P.C.
4183 Carmichael Road, Ste. B
Montgomery, Alabama 36106

/s/ Scott M. Speagle
OF COUNSEL