IN THE DISTRICT COURT OF THE UNITED STATES FOR THE
MIDDLE DISTRICT OF ALABAMA NORTHERN DIVISISON

ERNEST N. FINLEY, JR.,           )
                            )
       Plaintiff,        )
                            )
    v.              )CIVIL ACTION NO.: 2:23-CV-00146-KFP
                            )
CITY OF MONTGOMERY and  )
MAYOR STEVEN L. REED,    )
                            )
       Defendants.    )

**DEFENDANT STEVEN L. REED BRIEF IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

**COMES NOW** Defendant Mayor Steven L. Reed, by and through his undersigned
attorneys of record, and respectfully submits the following Brief in Support of his Motion for
Summary Judgment per Fed. CIV. P 56., and as grounds state as follows:

## I.    INTRODUCTION:

On January 31, 2022, Plaintiff filed an EEOC complaint (Exhibit A) alleging various federal
employment discrimination claims and several state law claims against defendants. On March 12,
2024, this court entered an Order (Doc. 60) on Defendant Reed's Motion to Dismiss Plaintiff's First
Amended Complaint (Doc 45).  This Court entered the following orders on Plaintiff's amended
claims:  (1) Count I and II of Plaintiff's First Amended Complaint to the extent that Finley brings
claims pursuant to Title VII is Moot: (2) Counts III, IV, and XIV of Plaintiff's First Amended
Complaint were dismissed; and Counts V, X, XI, XII and XV of Plaintiff's First Amended
Complaint were not dismissed.

Plaintiff's initial EEOC Charge (Exhibit A. pp. 1-2) shows that he is a 60 year old black
male hired by the City of Montgomery as Chief of Police in January 2015. Plaintiff alleges by

sworn charge that he served in that position "*until I was forced to resign by the Mayor in June 2021". (Exh. A, p.1).* Plaintiff goes on to state that the basis for his forced resignation was that on or about "April, 2021, "the Mayor and City caused false complaints to be made against me to the Alabama Ethics Commission". (*Id., p. 1).* Plaintiff further alleges . . . "I had investigated several police officers for policy violations, fraud and theft. Our attempts to follow the disciplinary policies and discipline those officers were met with opposition by the Mayor and certain police officers. The *Mayor encouraged the officers to complain to the Council for the City of Montgomery." (Id., p.1). However, I was told by the Mayor that neither I nor anyone reporting to me could speak to defend the Police Department or ourselves at the same meeting"* (Id., p. 1).

Further in the EEOC charge Plaintiff asserts: *"It is my belief that the Mayor wanted me removed from my position because he did not approve that I was enforcing Civil Rights laws of the United States and hired, promoted and disciplined employees equitably, regardless of race or gender."* (Id, p. 1).

It is important to briefly point out that the discovery in this case does not support that Plaintiff's voluntary separation from the Montgomery Police Department had anything to do with his alleged "*enforcing Civil Rights laws".* On appeal of the officers' discipline, Mayor Reed within his discretion and authority lowered the recommended discipline. When asked about this in his deposition, Plaintiff responded as follows on pages 184 -185:

> Finley Line 1:   A.   "My option has always been termination".
> Atty. Davis Line 4: " How did - - who came up with suspension??
> Finley Line 6:       "That's – that was from the mayor and chief, not chief City Attorney Stacy Bellinger. But the mayor came up with option two.
> Atty. Davis Line 8:   All right. Now in deciding these two options, did the Mayor have authority to choose option two?
> Finley Line 11.      Yes.
>                       (Exhibit B, Finley Deposition, p. 184-185)

Page Number(s)

**TABLE OF CONTENTS**

I. INTRODUCTION                                                                1
    A. Surviving Federal Claims against Mayor Steven Reed            3
    B. Surviving State Claims against Mayor Steven Reed.            3
                                                                  4

II. STATEMENT OF UNDISPUTED FACTS.                                             4

    A. Earnest Finley becomes Chief of Police                      4
    B. Reaves assignment to Chief Deputy of Operations            5
    C. Police Department Off-Duty Employment Investigation        6
    D. Reaves Fails the October 20, 2020, Firearms Qualifications (Leading to Ethics Complaint)    10
    E. Marcus Webster files a City Investigations Complaint on October 23, 2020, regarding the Change in Firearms Policy to benefit Reaves    16
    F. Webster's November 3, 2020 Ethics Commission Complaint    17
    G. The City Approves Legal Representation for Finley and Reaves    19
    H. The April 6, 2021, Montgomery City Council Work Session    69
    I. Finley Resigned as Chief of Police on June 8, 2021        77
    J. The August 4, 2021, Ethics Commission Findings
    L. September 1, 2021, Press Release                          84
    M. The Attorney General Issues Findings on November 18, 2021    87

III. ARGUMENTS AND CITATIONS OF AUTHORITY                                      88

    A. LEGAL STANDARD                                            88
    B. Federal Claims                                            91
      1. There is no Hostile Work Environment or Race Discrimination    91
      2. No Conspiracy to Violate Plaintiff's Free Speech, Due Process and Equal Protection Under Counts X and XI    127
    B. STATE LAW CLAIMS ANAYLSIS:                                143
      1. Count XII – Civil Conspiracy Due Process, Protected Speech.    143
      2.COUNT XIII – Defamation, Libel & Slander                150
      3. Count XV – Invasion of Privacy:                         162
    VI. Qualified Immunity for Counts V, X and XI                166
    V. State Agent Immunity - Section 11–47–190 Immunity          180
    VI. CONCLUSION                                                183

**A.  Surviving  Federal Claims against Mayor Steven Reed:**

The Amended Complaint alleges  three (3)  surviving  federal  causes  of

action  against  Defendant Reed:

Count V alleges that Mayor Reed committed invidious race discrimination,

co-worker harassment and created a hostile work environment against plaintiff in violation of equal

protection guaranteed by the 14th Amendment because Plaintiff refused Mayor Reed's insistence that

Plaintiff hire" Black Officers" over more qualified "White Officers". Doc. 42, ¶139 p. 25)

Count X alleges defendants conspired to violate Plaintiff's free speech rights guaranteed

by the 1st and 14th Amendments in violation of 42 U.S.C. 1985 by prohibiting him from opposing

race discrimination alleged committed by defendants' in their supervision of the Montgomery

Police Department. Doc. 42, ¶211. 38)

Count XI  alleges that Defendants acting through their agents and employees

discriminated against Plaintiff in the terms and conditions of his employment as Police

Chief. Doc. 42, ¶217 p. 40)

**B.  Surviving State Claims against Mayor Steven Reed**

Counts XII, XIII, and XV alleges various state law claims, each of which

incorporates by reference Plaintiff's jurisdictional and factual averments in his

complaint (Doc. 42, §§1-90).

Count XII alleges that the City and Mayor Reed engaged in a civil conspiracy to deprive

Plaintiff of an alleged property interest in his employment and to retaliate against him for the

exercise of his "federally protected right to speak out on matters of public concern."  (*Doc. 42, ¶ 226*).

Count XIII  claims the City and Mayor Reed committed intentional slander and

libel when they allegedly published defamatory job performance statements against Plaintiff and eventually caused an unwarranted ethics investigation into him. (*Doc. 42, ¶ 232*).

Count XV, and final count, states: "*. . . Defendants took actions seeking to invade the privacy of Plaintiff by conspiring to bring false charges and fabricated evidence against him. . ."* essentially by participating in an ethics investigation. (Doc.42, ¶ 251).

As a factual foundation for both his federal and state law claims, Plaintiff sets forth his personal demographics which presumably makes him subject to prohibited discrimination, to wit:   he is a black male, 60 years of age who was forced to resign under threat of termination. (Doc. 42, ¶¶13 - 17).

## II.    STATEMENT OF UNDISPUTED FACTS

### A.  **Earnest Finley becomes Chief of Police.**

Ernest Finley became the Chief of Police for the City of Montgomery in 2015.Finley was hired under Mayor Todd Strange. While Finley was chief under Mayor Strange, he made recommendations for discipline and termination to Mayor Strange. According to Finley, there was no difference in how Mayor Strange and Mayor Reed responded to his recommendations.  Todd Strange's term ended in 2019 and Mayor Steven  Reed's began. Finley recognized that a new administration would provide new direction and priorities for the police department. Reed's priority was homicides and police visibility. Finley and Reed had the same goals. Finley felt comfortable with communications during Reed's first nine months as mayor.  (Finley Depo. Vol. 1, p. 7.)

### B.  **Reaves assignment to Chief Deputy of Operations**

The Chief of Operations position is an appointed position and not a merit position. (Finley Depo., p.423, ll.7-13). It is not a position where officers take a test and place on a roster in bands to be

promoted like all of the ranks below. The position of major is the highest position for which there is a promotion roster. As Chief of Police, it was Finely's decision on how many deputy chiefs he wanted to have. (Finley Depo., p.421, l.18 – p.423, l.3). At times he had two and at times he had three. (Id.)

Shannon Youngblood (WM), held the position of Chief of Operations prior to Reaves. (Finley Depo., p.423, ll.4-23). On two occasions, when the Chief of Staff was not there, she filled in. (Reaves Depo., p.21, l.15 – p.22, l.10). On one occasion, this was to cover Chief Deputy Zedrick Dean and, on another occasion, it was to cover former Chief Deputy John Bowman. (Id.). Both of those assignments took place when Ernest Finely served as the Chief of Police. (Reaves Depo., p.23, ll.3-9).

After Reaves filled in for Dean, Dean and Finley discussed replacing Youngblood as Chief of Operations. (Dean Depo., p.285, ll.1-19). Finley mentioned that he thought Reaves had done a great job when Dean was out and asked Dean about her. (Id.). Dean concurred and agreed that Reaves should be made Chief of Operations. (Id.).

It was Finley's complete discretion to move an officer from Chief of Operations to his appointed rank of major. (Finley Depo., p.424, ll.6-15). Finley reassigned Youngblood from the position of Chief of Operations because he lost confidence in his ability. (Finley Depo., p.424, ll.1-5; Reaves Depo., p.178, ll.11-19).). All Deputy Chiefs have the rank of Major and are paid as a Major but given a stipend. (Finley Depo., p.424, l.22 to p.425, l.2). When Youngblood was Chief of Operations he received that stipend. (Finley Depo., p.425, ll.8-10). When he was reassigned, that stipend was taken away. (Finley Depo., p.425, ll.14-17). Since Youngblood's appointed rank was a major, when he was reassigned from his position as Chief of Operations, he remained a major until he retired. (Finley Depo., p.424, ll.6-11).

On June 25, 2020, Reaves was assigned to replace Youngblood as the new Chief Deputy of Operations. Finley promoted Reaves to the position of Chief Deputy of Operations because he believed she was the best qualified at the time. (Finley I Depo., p.98, l.6 – p.99, l.4).

There were other white deputy chiefs prior Reaves' appointment including Youngblood. (Reaves Depo., p.111, ll.8-13). Like Youngblood and all other Deputy Chiefs, she received assignment pay in the form of a stipend that accompanied the position. (Barnes Depo., p.15, l.16 – p.16, l.2)

Mayor Reed approved the appointments of the people Finley placed in deputy chief positions. (Finley Depo., p.436, l.12 – p.437, l.3). Reed was not involved in the decision to assign Reaves to Chief of Operations as he gave his Chief of Police the discretion to have the people he believed could best assist him in leading and managing the police department. (Reed Depo., p.259, l.12 – p.269, l.15; Reed Depo., p.261, ll.12-16). No one with the City, including Mayor Reed, ever told Finley not to appoint or promote a person because they were white or because they were female. (Finley Depo., p.437, ll.4-23). Similarly, no one with the City, including Mayor Reed, ever told Finley to demote someone because of their race or because they were a female. (Finley Depo., p.437, l.20 – p.438, l.4). Finley was never asked by the Mayor to demote or reassign Reaves. (Finley I Depo., p.105, ll.17-22).

### C.  Police Department Off-Duty Employment Investigation

In September 2020, Lieutenant Carson received a call from the Woods RV Park about dissatisfaction with MPD security. (Reaves Depo., p.33, ll.11-22; *Webster v City of Montgomery*, 710 F. Supp. 3d 1116, 1121 (M.D. Ala. 2023)). Carson advised Reaves, who in turn asked City Investigations to investigate. (Reaves Depo., p.33, l.21 – p.34, l.15; *Webster v City of Montgomery*, 710 F. Supp. 3d 1116, 1121 (M.D. Ala. 2023)).

On October 1, 2020, Reaves sent Finley a memorandum requesting an investigation of Lt. Ferguson, Lt. Mackey, Lt. Webster, Sgt. Ware, and Sgt. Harris for possible ethical violations and policy violations regarding off-duty employment. (Defendant's Exhibit 20, Finley Depo., p.384, ll.1-13). The issue with off-duty employment is that they were contending that they were courtesy officers, which is a position where the officer is required to live on premises in exchange for a discount on rent versus a regular security officer who is paid. (Bellinger Depo., p.46, l.8 – p.49, l.17). The five officers

were allegedly manipulating the system or double dipping by being on the City payroll while also getting paid for extra off-duty jobs at the same. (Finley I Depo., p.199, l.16 – p.200, l.23). Webster believed that Reaves and Finley had concocted the investigation into the off-duty employment because the complaint that came in from the apartment complexes was on crime in the area, rather than the conduct for which he was charged. (Webster Depo., p.107, l.19 – p.108, l.10).

City Investigations conducted an investigation of these officers, and the investigation grew beyond the initial five to thirteen officers. (Finley Depo., p.385, ll.3-9;).  All individuals were investigated for violating the following policies:

1. Montgomery Police Department Written Directive 2.18.1 Outside ("Off-Duty") Employment;
2. Montgomery Police Department Written Directive 4.7.8 Code of Ethics;
3. Montgomery Police Department Written Directive 2.12.1;
4. City of Montgomery Ethics Policy, page 30.

(Id.)

The case was assigned case number 20-CI-195 and was investigated by Lt. Steve Hudson.; Bellinger Depo., p.41, l.11 – p.43, l.17). Charges were substantiated against ten of the thirteen officers. (Id.) At the end of the investigation, Finely was provided with a report from City Investigations. (Finley Depo., p.385, l.22 – p.386, l.2; Bellinger Depo., p.39, ll.16-19). The report from City Investigations did not include a recommendation for discipline. (Bellinger Depo., p.39, ll.11-15).

Two of the thirteen officers were under Dean's supervision. (Dean Depo., p.125, l.23 – p.126, l.14). He knew that other involved officers under Reaves were involved, so he reached out to city legal to make sure the recommended punishments were appropriate. (Dean Depo., p.126, l.23 – p.128, l.18). Dean was not familiar with the details of those officers and wanted to make sure everything was good. (Id.). They always want to make sure they're on the same page, following progressive discipline, and not treating anybody differently from anyone else. (Dean Depo., p.129, l1 – p.130, l.4).

Ultimately, following Reaves' recommendation, Finley recommended that Webster, Mackey,

Harrison, Ware, and Morris receive demotion in rank, 20-days suspension, Ethics Review Board request, and suspension of off-duty employment for one year. (Defendant's Exhibit 21, Finley Depo., p.386, l.3 – p.387, l.9). Other officers received three-day suspensions and written reprimands. (Defendant's Exhibit 21, Finley Depo., p.388, l.15 – p.390, l.10). Some of these officers received different punishment because it was a permanent job with proper documentation versus the more serious conduct of the other employees. (Finley Depo., p.389, l.2 – p391, l.2). The disciplinary actions taken were recommended by the Chiefs Dean and Reaves and Finley after looking at the severity of each violation and that individual's history with the department if applicable. (Finely Depo. Vol 1, p.381, ll.5-16, Reaves pp.42-44).

| Officer | Race | Gender | Determination | Disciplinary Action |
|---------|------|--------|---------------|---------------------|
| A.F. | B | M | Substantiated 48 policy violations | Terminated for other reasons. |
| J.M. | B | M | Substantiated 29 policy violations | Suspension for 20 days, demotion in rank, & suspended from working off-duty jobs for a year. |
| A.P. | B | M | Substantiated 13 policy violations | Suspension for 24 working hours and suspended from working off-duty jobs for one year. |
| A.C. | B | M | Substantiated 2 policy violations | Suspended for 24 working hours and suspended from working off-duty jobs for one year. |
| E.W. | B | M | Substantiated 12 policy violations | Suspension for 20 days, demotion in rank, and suspended from working off-duty jobs for a year. |
| M.W. | B | M | Substantiated 16 | Suspension for 20 days, demotion in rank, & |

| | | | policy violations | suspended from working off-duty jobs for a year. |
|---|---|---|---|---|
| J.H. | B | M | Substantiated 12 policy violations | Suspension for 20 days, demotion in rank, & suspended from working off-duty jobs for a year. |
| E.M. | B | M | Substantiated 4 policy violations | Suspension for 20 days, demotion in rank, & suspended from working off-duty jobs for a year.[3] |
| D.R. | B | M | No substantiated policy violations | |
| J.A. | W | M | Substantiated 1 policy violation | Received a Letter of Reprimand. |
| C.D. | B | M | No substantiated policy violations | |
| J.C. | B | M | Substantiated 2 policy violations | Suspended for three working days. |
| W.B. | B | M | No substantiated policy violations | |

After the officers were notified of their recommended discipline, some of them met with Chief Finley, had an evidentiary hearing before Judge Charles Price, and also had an evidentiary hearing on June 30, 2021, and August 3, 2021, before the Montgomery City-County Personnel Board. Webster believed that Reaves disciplined white officers less harshly than she did black offers and that it was based on race. (Webster Depo., p.125, l.19 – p.127, l.8).

As a result of the off-duty employment investigation, the officers were upset that they were disciplined, lost twenty days' worth of pay, lost income for authorized off-duty work for a year, they were demoted, and they could no longer pull off the scheme that they had going on which cost them money. (Reaves Depo., p.134, l.16 – p.135, l.2). Others were also upset about the off-duty work policy.

(Finley Depo., p.106, l.19 – p.107, l.6). <u>It is these officers Finley contends provide the basis upon which he claims he was targeted and discriminated against by Mayor Reed because most of the officers being investigated and disciplined were black and the Mayor imposed discipline short of termination.</u> (Finley Depo 1. p.123-124).

**D. <u>Reaves Fails the October 20, 2020, Firearms Qualifications (Leading to Ethics Complaint)</u>**

It is important for officers to qualify and be able to accurately shoot so that they can protect lives and the community. (Finley Depo., p.377, ll.2-8). Policy 2.311, effective September 11, 2012, entitled "Firearms Qualifications," required an officer to score no less than 76 in two attempts of qualifications held twice a year. (Ex. 7, Finley Depo., p.273, l.21 – p.275, l.12). Under the 2012 version of Policy 2.311, there were penalties for failure to qualify including termination, a 40-hour remedial class, and loss of off-duty employment opportunities. (Id.).

Policy 3.2.4 regarding weapons in training purported to rescind Policy 2.311 when it became effect June 25, 2018. (Defendant's Exhibit 8, Finley Depo., p.276, l13 – p. 277, l.4). Policy 2.311 was in PowerDMS, however, in October of 2020. (Bellinger Depo., p.256, ll.19-21). As a result, Dean, for example, was still operating under Policy 2.311 in October 2020. (Dean Depo., p.239, ll.3-12). Policy 3.2.4 required an officer to receive a qualification score of 76 during two attempts. (Id.). It removed most of the penalties, but left in place that the officer must successfully complete remedial training

---

1 Under Policy 2.311, the first failure involves a counseling form and a loss of off-duty employment. (Bellinger Depo., p.255, l.10 – p.256, l.3). The second official failure involves a letter of reprimand, a loss of off-duty employment until the eight-hour remedial class is successfully passed as well as take-home vehicle privileges until the remedial class is passed. (Bellinger Depo., p.256, l.4-11). The third failure involves an automatic two-day suspension with an additional day for each official failure as well as some other additional consequences including loss of a take-home vehicle1. (Bellinger Depo., p.256, ll.12-18).

prior to resuming official duties. (Id.).

Policy 3.2.4 was amended, effective January 15, 2020, but carried the same requirement of receiving a qualification score of 76 during two attempts with a penalty of successful completion of remedial training prior to resuming official duty. (Defendant's Exhibit 9, Finley Depo., p.278, l.18 – p.281, l.2).

During the week of October 19, 2020, MPD held its annual Firearms Qualifications. (Finley Depo., p.264, ll.4-12; get better cite for Ex. 72, Ex. 72). In preparation for the October 2020 firearms qualifications, Dean sent an email to Command Staff. (Dean Depo., p.300, ll.2-23, Exhibit 10). In that policy, officers were notified they would lose off-duty work if they failed to qualify because in Dean's mind Policy 2.311 was the current policy. (Dean Depo., p.300, l.2 p.310, l.6). Four hundred forty-four (444) officers participated in the 2020 qualifications. (Id.). Reaves signed in on the second day, Tuesday, October 20, 2020 to qualify. (Id.; Finley Depo., p.267, ll.4-5). She failed to qualify that day. (Finley Depo., p.339, ll.3-22). Seven officers had failed to qualify before her on Monday October 19, 2020. (Id.) Reaves came to Dean after she failed on her second attempt and asked if she could do a redo. (Dean Depo., p.265, ll.5-12). Dean told her she could not and that is when Reaves went to Chief Finley. (Id.). After she failed to qualify, Finley noticed that as Reaves was leaving the shooting range she was upset. (Finley Depo., p.335, l.5 – p.336, l.3). Reaves advised him that she had failed to qualify, and Finley advised her she could have a third opportunity. (Id.). While at the shooting range on October 20, 2020 Finley changed the policy to allow a third attempt and lowered Montgomery's mandate from 76 to 70 and changed it from two attempts to three attempts. (Finley Depo., p.347, ll.18-23; Finley Depo., p.378, ll.18-23). This was highly unusual as typically, when a practice or policy changed, prior to the change the policy was circulated to City Investigations and usually legal for review and feedback. (Bellinger Depo., p.166, l.21 – p.167, l.15). Once the policy was finalized, it usually became effective 30 days after the implementation date. (Id.).

The reason Finley provided for giving Reaves a third attempt was because there was a higher-than-average number of officers failing to qualify. (Finley Depo., pp. 269-270). Dean does not recall there being a higher number of people who didn't qualify on the first day; it appeared no more than usual to him. (Dean Depo., p.223, ll.13-21). There has always been a discussion during qualifications about there being a large number of poor shooters. (Dean Depo., p.225, l.10 – p.226, l.2). In fact, there was virtually no difference in the number of officers who failed to qualify in 2019 versus 2020. (????AFF. ) In 2019, there were 373 officers who shot during qualification week with 37 MPD officers who failed to qualify by shooting a 76 or better in two attempts. (AFF ?????). By the end of the first day of 2019 qualifications five (5) officers had failed to qualify and by the third day twenty-seven (27) total officers had failed to qualify in 2019. (*Id*.) In 2020, there were 442 officers who shot during qualification week with 39???? MPD officers who failed to qualify in two attempts. By the end of the first day of 2020 qualifications there were seven (7) officers who failed to qualify using the original standards and by the end of the third day there were twenty nine (29) officers who had failed to qualify under the original standards. (*Id*.)  Twenty-nine officers had to attend the 8-hour remedial training because they failed to qualify during their first two attempts. (Barnes Depo., p.294, ll.1-15).

Everyone was upset about Reaves getting a third attempt at the shooting range. (Dean Depo., p.220, ll.2-6; p.281, l.4 – p.282, l.20). There had never been a third attempt until that day. (Dean Depo., p.222, ll.2-14). Only Chief Finley could change the policy to let someone shoot three times. (Dean Depo., p.278, ll.17-19). Because there was concern by other officers that those under their command were not being allowed a third attempt to qualify, Finley directed Milner to notify everyone that an opportunity would be given for one more attempt to qualify on Thursday, October 22. (Defendant's Exhibit 18, Finley Depo., p.323, l.3 – p.324, l.15). Finley had a discussion with Sgt. Killough advising him that "everybody deserves a third round, don't advertise it…" (Finley Depo., p.265, l.17 – p.266, l.17). Finley advised Killough that a memo would be forthcoming to make it clear that officers have

13

an opportunity for a third attempt because he was changing the policy. (Finley Depo., p.268, l.21 p.270, l.13).

After the end of the third day of qualifications, on Wednesday, October 21, 2020, at 10:59 p.m. Captain Milner sent an email out advising that anyone who had failed to qualify during their first two attempts would be given a third opportunity on Thursday, October 22, 2020. (Finley Depo., p.339, l.23 – p.340, l.10; Webster Depo., p.72, l.12 – p.73, l.7). All of the people who failed to qualify were given a third opportunity. (Webster Depo., p.75, ll.8-10). Finley officially changed the policy November 3, 2020, lowering the qualifying score from a 76 to a 70 and providing all shooters with three attempts to qualify. (Finley Depo., p.272, ll.1-17; DX 13, Finley Depo., p.291, l.11 – p.293, l.6).

Because there was confusion about which policy applied and some people had failed before Finley changed the policy, and others failed after the policy changed but did not hear the verbal order to change, employee counseling records were prepared for some officers who failed to pass the firearm qualifications.  (Barnes Depo., p.283, l.1 – p.284, l.9). MPD officers later received a memo from Chief Finley saying that no one would actually receive the write-ups because he changed the policy. (Id.) The change in policy caused chaos because people had already been written up. (Id.).

In addition, following Finley's change in policy on the handgun qualification, Bellinger advised Finley that even though he could change the policy, the remedial training still needed to be carried out for those who had failed to qualify on two attempts. (Bellinger Depo., p.148, l.21 – p.150, l.2). Her concern was not that he changed the policy, but that it was a verbal change in the middle of the qualifications. (Bellinger Depo., p.150, l.18 – p.151, l.7). Bellinger reached out to Finley regarding her concerns about requiring the officers to attend remedial training and was advised that they had not done so. (Bellinger Depo., p.157, l.13 – p.158, l.3). He indicated he would make it happen, however. (Bellinger Depo., p.158, l.15 – p.159, l.1).

Although policy 2.311 purported to be rescinded by Policy 3.2.4 effective June 25, 2018, Policy

2.311 remained on the Power DMS system available to officers2. (Bellinger Depo., p.256, ll.19-21). The prior policy that Chief Finley had changed when he became police chief requiring specific disciplinary action had not been archived by the individuals maintaining the policies and procedures, so it was still accessible by all officers. (Bellinger Depo., p.151, l.20 – p.152, l.6). If a policy is replaced, updated, or amended, the old policy should not be on PowerDMS. (Dean Depo., p.241, l.23 – p.242, l.6).

This created confusion3 because two different polices provided two different sets of discipline standards and both were on PowerDMS. (Cite) Some officers were enforcing 2.311 in October of 2020 and continuing to write up employees who failed to qualify using the more severe Policy 2.311 criteria. (Bellinger Depo., p.257, ll.14-21). In fact, Barnes advised Webster that he needed to write up whatever personnel had failed the firearms qualifications. (Barnes Depo., p.315, l.22 – p.316, l.9; see also Bates Nos. 2076 & 2077). In addition, on May 9, 2019, Cpl. D.L. Johnson was written up by his supervisor Lt. R.L. Dorsey for scoring less than 76 during two attempts at qualification. (Defendant's Exhibit 10, Finley Depo., p.281, ll.3-17). Penalties imposed on Cpl. Johnson required that he had "to attend open range at least once a month to correct any deficiencies you are having with your handgun. Additionally, you have lost the right to work off-duty employment until you successfully complete remedial training. Any future infractions with result in progressive discipline in accordance with Policy 2.311 Firearms Qualifications." (Id.; Finley Depo., p.285, ll.14-23).

---

2 Dean did not have any responsibilities regarding updating or providing documents to PowerDMS. (Dean Depo., p.60, ll.4-7). Cpt. Derek Carson was in charge of that. (Dean Depo., p.60, ll.8-16; p.63, l.8-20). When policies are updated, an email goes out to review them in Power DMS. (Dean Depo., p.64, ll.13-22). Every officer has their own login, and you would simply log in and review the policy. (Dean Depo., p.65, ll.13-17; p.67, l.11-15).

3 Barnes described all the confusion and changes as a "debacle." (Id.).

In addition, on Tuesday, October 20, 2020, at 1:33 pm, Montgomery Police Chief Deputy Zedrick Dean sent a reminder to Command Staff using Policy 2.311 standards when he asked them to "please remind any of your personnel who failed qualifications will not be able to work off-duty jobs until they clear remedial. Thanks!" (Defendant's Exhibit 11, Finley Depo., p.288, ll.1-17). Thus, while it was the *intention* for Policy 3.2.4 to rescind 2.311, many in the department were still operating under 2.311. The reality was that 2.311 was considered to be an active policy. And, Finley agreed that policy or procedure is what a department does regardless of whether it conflicts with what is written. (Finley Depo., p.302, l.21 – p.303, l.3).

To further add to the confusion, an amendment to Policy 2.311 (which was supposed to be rescinded in 2018) was issued on November 3, 2020, after handgun qualifications were completed. (Defendant's Exhibit 14, Finley Depo., p.293, l.15 – p.297, l.7; Bellinger Depo., p.266, l.20 – p.267, l.9). Although the amended Policy 2.311 dropped the qualifying score to 70 and provides three rather than two attempts to qualify, there are still penalties for official failures including loss of off-duty employment for a period of six months, loss of a take-home vehicle for six months, letters of reprimand, and suspension. (Id.) And if that were not enough confusion on the issue of which policy was controlling, Bill Barousse sent a memorandum on December 4, 2020 requiring all officers who failed to qualify within two attempts to attend remedial training under the old Policy 2.311. (Defendant's Exhibit 15, Finley Depo., p.297, l.1 – p.300, l.18).

It never occurred to Finley that lowering the qualifications was considered dangerous and offensive to some of the Montgomery Policy Department officers. (Finley Depo., p.377, ll.14-18).

### E. Marcus Webster files a City Investigations Complaint on October 23, 2020, regarding the Change in Firearms Policy to benefit Reaves

On October 23, 2020, Webster filed a complaint (20-CI-205) with City Investigations because he was upset about the on-the-spot change in firearms qualifications that Finely made on October 20.

2020. (Finley Depo., p.317, l.18 – p.319, l.21, Ex. 17, p.357, l.14 – 358, l.1; Dean Depo., p.280, ll.2-5). Webster actually commenced two internal complaints, one through the chain of command through Denise Barnes and the other through City Investigations with Bill Barousse. (Finley Depo., p.358, ll.2-10).

In the complaint, he alleged that Finley had abused his power by changing the policy when Reaves failed to qualify. There is nothing in Webster's complaint that mentions Reaves' race or gender. (Reaves Depo., p.58, l.22 – p.59, l.2). Instead, the complaint is about the regulations for firearms qualifications being changed. (Reaves Depo., p.59, ll.3-6). In addition to Jennifer Reaves being given a third opportunity to qualify, Chief Finley's son, Ernest Finley III (BM), was also given a third attempt to qualify. (Webster Depo., p.66, l.10 – p.67, l.22). Webster believed this was an unfair benefit because Reaves was the first one to be given the third time to shoot even though others before had failed to qualify, and it was only after other people started to complain that people were given an opportunity to go out and shoot a third time. (Webster Depo., p.68, ll.3-18).

Finley was interviewed as part of the investigation by CI and stated that he had the power to make an immediate change pursuant MPD Directive 1.4.1 (Finley Depo Vol 2, pp. 332-333) Dean was not involved in the internal investigation with City Investigations regarding the complaints at the shooting range. (Dean Depo., p.35, ll.5-12). CI found that all officers were ultimately given a third opportunity to qualify and the Chief of Police is the individual with the power to change policy. (Finley Depo. Vol 2, 350) On October 29, 2020 Bill Barousse, as Director of City Investigations, found no evidence to support violation of policy and the allegation was UNFOUNDED. (Id.).

### F. **Webster's November 3, 2020 Ethics Commission Complaint**

Webster filed his complaint with the State of Alabama Ethics Commission on November 3, 2020. (Webster Depo., p.71, l.12 – p.72, l.11;). He is the only person who filed a complaint with the Ethics Commission. (Reaves Depo., p.122, ll.17-20). Reaves admits that Mayor Reed did not file any

17

complaint with the Ethics Commission. (Reaves Depo., p.122, l.21 – p.123, l.4).

When he filed his complaint with the Ethics Commission, Webster had no knowledge that Byron Butler worked there. (Webster Depo., p.78, l.19 – p.80, l.14). And, he did not talk to anyone with the Ethics Commission prior to filing his complaint on November 3, 2020. (Webster Depo., p.80, l.6 – p.81, l.3). The City of Montgomery did not provide Webster with an attorney to assist him with the Ethics complaint, and has never provided him with an attorney for any matter. (Webster Depo., p.15, ll.1-3).

Webster provided Butler with the statement he gave to City Investigations as well as other documents regarding the firearms qualifications. (Webster Depo., p.27, l.20 – p.29, l.5). Webster believed that Reaves was the first one to fail firearms qualifications and given three times to shoot. (Webster Depo., p.31, l.23 – p.33, l.22). Detective Richardson, who was under Webster's command, failed to qualify two times and Webster had been told by Major Barnes to write him up. (Id.). He did not believe that was fair and wanted to challenge the fact he had to write Richardson up. (Id.). After a lot of people got upset, the rumor was that the Police Department was told by Legal that they had to let everybody shoot three times. (Id.; Webster Depo., p.34, ll.6-15).

Webster sent documents to Byron Butler on April 16, 2021. (Webster Depo., p.58, ll.4-14). Reaves admits that Mayor Reed did not forward any information to the Ethics Commission. (Reaves Depo., p.122, l.21 – p.123, l.4). Stacy Bellinger and Marcus Webster are the only two individuals Reaves believes provided information to the Ethics Commission, and there is nothing that Stacy Bellinger forwarded that is false or fraudulent. (Reaves Depo., p.123, ll.5-15; Finley Depo., p.216, ll.15-22).

As part of Bellinger's official job duties, she handled matters involving the Alabama Ethics Commission. (Bellinger Depo., p.22, ll.17-19). Once Bellinger realized there were multiple policies on firearms, she spoke with Butler and advised him that there were policies that should have been

archived but were not. (Bellinger Depo., p.182, l.17 – p.183, l.18). Bellinger is the one who initiated the fact that there were multiple policies on handgun qualification with Butler. (Bellinger Depo., p.195, ll.11-15). She did so because Lt. Carson had made her aware that 2.311 should have been archived and was not. (Bellinger Depo., p.195, l.16 – p.196, l.11). She wanted to be clear "about the confusion at MPD and why a policy that wasn't in effect was produced and what we were producing." (Id.). When she forwarded the letter about the change in policies, she also sent the policies. (Bellinger Depo., p.197, ll.6-9). Bellinger advised Butler that there was no financial gain by either Finley or Reaves by the change in the handgun qualification policy. (Bellinger Depo. p.185, ll.11-15). She also told Butler that based on everything they had looked at, it was their opinion that there were no ethics violations. (Bellinger Depo., p.184, l.15 – p.185, l.6).According to Finley, Bellinger provided fair and correct information to the Ethics Commission. (Finley Depo., p.89, l.20 to p. 90, l.3).

The extent of the alleged conspiracy between Marcus Webster and the Mayor's office over filing Webster's complaint with the Ethics Commission is that the mayor was potentially aware of it, even though Reaves has no evidence of this. (Reaves Depo., p.124, l.14 – p.125, l.14). Reed never talked to anyone at the Ethics Commission about Jennifer Reaves. (Reed Depo., p.209, ll.16-19). He never partnered with Butler on anything. (Reed Depo., p.196, l.8 – p.197, l.8). Reed was not aware that Marcus Webster was the person who complained or filed the ethics complaint against Finley and Reaves. (Reed Depo., p.212, ll.3-6). Similarly, Finley has no evidence that the mayor forwarded false and fraudulent information to the Ethics Commission. (Finley Depo., p.454, l.17 – p.457, l.12). He has no evidence that Reed conspired with Butler and Raulston to manipulate evidence. (Finley Depo., p.457, l.13 – p.458, l.16).

### G.  The City Approves Legal Representation for Finley and Reaves

Finley and Reaves both contacted Bellinger after they received a letter from the Ethics Commission to ask about legal representation. (Bellinger Depo., p.105, ll.2-10). The City Council

would have to approve this, so it was presented to them. (Bellinger Depo., p.107, ll.5-22). Reed did not oppose providing legal representation to Finley and Reaves. (Reed Depo., p.162, ll.5-11). The City of Montgomery provided counsel and paid to defend Reaves and Finley during the Ethics investigation. (Reaves Depo., p.184, ll.12-19). The City hired attorney Barbara Wells to represent Reaves before the Ethics Commission. (Reaves Depo., p.316, ll.7-12). The City hired attorney Peck Fox to represent Finely before the Ethics Commission. (Finley Depo., p.232, l.12 to p. 234, l.2; Reaves Depo., p.316, ll.7-14). The City fully defended the Ethics lawsuits and successfully defended those lawsuits. (Reaves Depo., p.265, ll.8-13).

## H.  The April 6, 2021, Montgomery City Council Work Session

The City Council agenda is set by the City Council and the Mayor does not have the authority to put anyone on the agenda. (Reed Depo., p.123, ll.3-14). At the City Council meetings, Reed is not usually aware of who is signed up to speak prior to the meetings. (Reed Depo., p.121, ll.11-20). His role is to give the Mayor's message at the beginning of the meeting. (Id.). Prior to the City Council Meeting at 5:00 p.m., they have an hour long work session that beings at 4:00 p.m.. (Jinright depo. ).

On April 6, 2021, then current Montgomery Police Department officers Jacoby Thaggard (BM), Jarius Booker (BM), Marcus Webster (BM), John Mackey (BM), XXXXX Officer Flaydon???Clayton??? (WF), former officers Antavione Ferguson (BM) and Renee James (BF), attorney Scott Morro, (WM) who represented several of the officers, and Pasto Ed Nettles (BM) spoke at the 4p.m. work session prior to the 5 p.m. City Council Meeting. (https://www.youtube.com/watch?v=0pjahvrGU7k). Reed did not encourage black officers to file complaints against Finley or Reaves. (Reed Aff. ¶5   ) Nor did he encourage anyone to speak before the City Council about their complaints with Reaves, Finely or anyone at MPD. (Reed Aff.  ¶6   ). No one person organized them to speak at the April 6th work session. (Webster Depo., p.134, l.11 – p.135,

l.5). Several of the officers just came together because they felt like something needed to be done. (Id.).

Webster spoke at the work session and the basis of his complaint was that Finley and Reaves were doing things that went against policies, they were lying, and controlling City Investigations such that investigations were not being properly investigated. (Webster Depo., p.93, l.18 – p.94, l.6). He said that they were manipulating the policies to their own personal agendas. (Webster Depo., p.95, ll.3-16). Webster and the others disputed all of the charges against them. (Webster Depo., p.98, ll.12-18). Reed, did not speak about Finley or Reaves at the April 6, 2021 City Council Work Session. (Reed Aff. 6).

The Command Staff were required to be in attendance at City Council meetings. (Barnes Depo., p.109, l.20 – p.110, l.21). Finley and Reaves were both there, but they did not speak at the meeting. Reaves contends that she was told by Finley that they were not allowed to speak in rebuttal of the comments made by these individuals. (Reaves Depo., p.243, ll.7-21).

Finley contends that the City and Mayor Reed conspired to deprive him of his First Amendment rights because he wasn't allowed to speak on a matter of public concern involving the off-duty employment. (Finley Depo. I, p.108).

Reaves admits, that the off-duty employment investigation had concluded, that she recommended punishment, that the punishment she recommended was given, and the officers were ultimately punished in accordance with her recommendation. (Reaves Depo., p.222, l. 22 – p.223, l.4).

Reaves also acknowledged that the City Council controls who is allowed to speak at its work sessions and meetings. (Reaves Depo., p.117, ll.1-3; p.118, ll.10-18). In reality, **The Montgomery Advertiser April 6, 2021, article**

On April 6, 2021, at 8:28 p.m., the Montgomery Advertiser published an article written by Kirsten Fiscus entitled, *Montgomery police officers claim retaliation, fudged reports by department*

*leadership.* (Ex.R). The article followed the April 6, 2021 Montgomery City Council Work Session and Meeting referenced above. (Id.) Those quoted in the article are Sergeant Jacoby Thagard, Attorney Scott Morro, Lieutenant Marcus Webster, and Sergeant John Mackey. (Id.). There is no quote by Mayor Reed, nor is there mention of any of their names in the article. (*Id.*) The sole reference to any quote or comment by the City is as follows:

> Griff Waller, a spokesman with the Mayor's Office, declined to comment on the various claims.
>
> "Tonight we heard allegations made by individuals," he said. "There is a legal process for personnel issues, and that process is ongoing."

### I.   <u>Finley Resigned as Chief of Police on June 8, 2021</u>

The Chief of Police is the chief executive officer of the police department and is responsible for the management, supervision of personnel, efficiency, and general conduct of the department. (Reed Depo., p.221, ll.7-15). In Finley's prior experience in Atlanta, when a new mayoral administration came in, they usually changed the police chiefs. (Finley I Depo., p.37, l.18 – p.38, l.4).

Mayor Reed started in January 2019. (Finley I Depo., p.45, l.22 – p.46, l.14). When he came in, his priority and concern was the homicide numbers. (Finley I Depo., p.47, ll.7-13). There were officers complaining to Reed about Finley from day one. (Reed Depo., p.236, ll.2-14). There were complaints that Finley disciplined haphazardly and/or only disciplined rank and file as opposed to brass. (Reed Depo., p.225, ll.7-21). Reed did not personally observe anything about how Finley ran the Montgomery Police Department that he perceived was an ethics violation, (Reed Depo., p.226, l.18 – p.227, l.5), but there were people in his ear to get crime under control and make the city safer. (Reed Depo., p.230, ll.5-13).

Reed held regular meetings with Finley where they discussed weekly updates on things that had happened over the weekend including administrative personnel, investigative issues, public safety

matters, crime statistics, and other similar issues. (Reed Depo., p.75, l.22 – p.77, l.22). Crime statistics were usually received on a weekly basis in a written report. (Id.). When Reed and Finley met, Reed would discuss areas where Finley needed to improve the result that was being given to the City's citizens. (Reed Depo., p.82, l.6 – p.83, l.1).

Finley's relationship with the mayor was good until the situation with the officers involved in the off-duty employment investigation came up. (Finley Depo., p.49, l.1 – p. 51, l.2). Finley believed their conduct violated policy, there was an investigation into the officers' use of their off-duty work, and he believes that the investigation was fair. (Finley Depo., p.51, l.17 – p.53, l.7). Following the investigation, he made recommendations to the Mayor's office for discipline of the officers. (Finley Depo., p.53, ll.8-13). Finley and the Mayor disagreed on the level of punishment for the officers. (Finley Depo., p.52, l.18 – p.54, l.3). Finely agrees, however, that the Mayor had the discretion to agree with the termination recommendation or to make another decision. (Finley Depo., p.56, ll.2-7). Finley believes that there was a change in his relationship with the Mayor after that meeting; there were less meetings in person and more information passing through document requests. (Finley Depo., p.58, ll.7-19).

Finley was aware that homicide numbers were way up in 2020; the highest they had been since prior to the early 1970s. (Finley Depo., p.229, l.4 – p.230, l.6).

Reed's office prepared a letter of resignation that he presented to Chief Finley when they met at City Hall. (Reed Depo., p.134, l.13 – p.135, l.17). The Mayor had the authority to terminate him. (Finley Depo., p.225, ll.1-10). Finley was told the basis for the separation was that crime was going in the wrong direction. (Finley Depo., p.118, l.20 to p.119, l.3). Finley voluntarily resigned in good standing during Mayor Reed's administration on June 8, 2021, to be effective July 8, 2021. (Finley Depo Vol 1. P.15-16)

### J.  The August 4, 2021, Ethics Commission Findings

On August 4, 2021, the Ethics Commission met and heard the ethics allegations against Finely and Reaves.. Motion passed unanimously (4-0) with Chairwomen Brady recusing. A motion was made by Chief Justice Stuart to amend that this case be handled administratively, to the Alabama Attorney General's office. Mr. McDonald seconded the motion with amended motion passing unanimously (4-0) with Chairwomen Brady recusing. Chief Justice Stuart moved that based on the evidence as presented to this Commission, there exists cause to hold that Ernest Finley has committed one minor violation of the Alabama Ethics Act.

### L.  September 1, 2021, Press Release

Finley contends that Mayor Reed made statements that he was convicted on a minor ethics violation and that defamed him, brought embarrassment and shame  to him and his family on a lie. (Finley Depo 1, 222, 234-235) However, the only other publication  Finly could be remotely referring to in an article  published on  September 1, 2021, featuring  "Interim Montgomery police chief: who stated: Department morale is 'coming back around.'" And the article mentions  Finley by name and Reaves had committed a "minor violation" of the Alabama Ethics Act. (*Id.*) Finley  alleges that "[t]he Mayor and the City intentionally disparaged him personally and professionally, and was retaliatory for him engaging in protected conduct as Police Chief." (Doc. 42, p.43 ¶234-235). (PX 24)

As can be seen from Plaintiff's Exhibit 24, this is not a press release by the City of Montgomery. (PX24). Instead, the statements appear in an article written by Ashley Bowerman and published by WSFA, not the City or Mayor Reed. Further, Mayor Reed does not sanction articles by news outlets. (Reed Depo., p.295, l.14 – p.297, l.1).

### M.  The Attorney General Issues Findings on November 18, 2021

On November 18, 2021, Alabama Attorney General Steve Marshall sent a letter to the Commissioners of the Alabama Ethic Commission as follows:

> I have elected to exercise my discretion as Attorney General to disapprove the proposed administrative resolution in the above-referenced cases. The State of Alabama will not

24

undertake any civil or criminal action in these matters. To the extent you found probable cause to believe that the above-referenced respondents violated the Alabama Ethics Act, I believe you did so based on incomplete or misleading information. As a matter of public record, I find that neither Respondent Reaves no Respondent Finley engaged in any criminal conduct whatsoever.

(PX 152).

## III.    ARGUMENTS AND CITATIONS OF AUTHORITY

### A.  <u>LEGAL STANDARD</u>

**Federal Rule of Civil Procedure 56(a)** states:

"A party may move for summary judgment, identifying each claim or defense or the part of each claim or defense — on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the  record the reasons for granting or denying the motion."

The 11th Circuit Court of Appeals has stated that: "Summary judgment is appropriated when no genuine dispute of material fact exists and a party is entitled to judgment as a matter of law. *Sutton v. Wal-Mart E., LP, 64 F.4[th] 1166, 1168 (11th Cir. 2023).* A dispute of fact is genuine if a reasonable jury could return a verdict for the non-moving party."  *Armando Banegas Guevara v. Lafise Corp.,No. 22-13383, p. 7, (11th Cir. 2025) citing Baxter v. Roberts, 54 F. 4th. 1241, 1253, (11th Cir. 2016).*

Further, The Eleventh Circuit has developed a framework for adjudication motions for summary judgment in cases involving Title VII discrimination. "Discrimination can be proven through direct or circumstantial evidence. *Hinson v. Clinch Cnty., Ga. Bd. Of Educ.*, <u>231 F.3d 821, 827</u> (11th Cir. 2000). Direct evidence is evidence that, "if believed, proves the existence of a fact without inference or presumption. Only the most blatant remarks whose intent could mean nothing other than to discriminate on the basis of some impermissible factor constitute direct

*evidence* of discrimination. *Fernandez v. Trees, Inc.*, 961 F.3d 1148, 1156 (11th Cir. 2020) (internal citations and quotations omitted). *Cf. Silver v City o f Pembroke,* 21-CV-61148-RAR (S.D. FL 2022).

### B.  Federal Claims

#### 1.    There is no Hostile Work Environment or  Race Discrimination

Where a plaintiff relies on circumstantial evidence of to prove retaliation and discrimination, it is be evaluated through the framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S. Ct. 1817, 1825, 36 L. Ed. 2d 668 (1973), *holding modified by* Hazen Paper Co. v. Biggins, 507 U.S. 604, 113 S. Ct. 1701, 123 L. Ed. 2d 338 (1993)).

Central to Plaintiff's claims of hostile work environment and race discrimination  by Mayor Reed in Count V of his Amended Complaint, and indeed his entire case are his  averments that arose out of a single incident involving Plaintiff's desire to discipline several officers more harshly than Mayor Reed did, in a circumstance where several officers were found guilty of violating MPD policy relating to off-duty employment. Most of the officers involved in the incident were Black .[Detailed in brief, Statement of Undisputed Facts, "Off-Duty Employment Investigation", p.6]  Plaintiff contends that he was harassed by the Mayor because he was black, for failure to give blacks preferential treatment in promotions, and that Plaintiff would not follow Mayor Reed's alleged race-based preferences.  **(Doc. 42, ¶¶ 142-144**).

Plaintiff admits that when he came to personnel matters, Mayor Steven Reed (black male) essentially supervised him in the same as the former Mayor Todd Strange (white male) did. (Exh, C, pp. 33-350). In fact, as to the discipline of officers, Plaintiff admitted that ". . . The same situation with Todd Strange and Mayor Reed, it's the same or similar. We had discussions, we didn't see eye to eye, agree or disagree. At the end of the day, whatever Mayor Reed wanted to have handled, it would be

done". (Jinright Exh, I, p.37, LL 2-10). . Plaintiff, having recommended termination, considered this too lenient and due to some officers having good relations with the community. (Finley II. Exh.B, pp. 55-56). In an effort to create the appearance of racial animus against him, Plaintiff here is attempting to recast  routine disciplinary activities  as allegations in terms of a hostile work environment. The plaintiff had full knowledge that officers often push back on harsh discipline and even file complaints against those instituting the discipline and that these activities have nothing to do with racial against him.  Plaintiff emphatically testified that when you go after "corrupt cops" you get "targeted" and there is push back from the officers, the constituency and the church. The targeting, he testified was not because of his race, but because, according to Finly, "I got to do my job."

A. . . .I always have taken the high road. This is not
the first time I'm in this rodeo. I put cops
in jail in Atlanta, it didn't matter, you know,
 my recommendation, or I physically had to put
them in jail. A corrupt cop is a corrupt cop.
So to be targeted in terms of doing my job
 because it don't look good to the constituency
 or to the churches, I got to do my job. And so
you got to listen to me, I will communicate
 with you, but these individuals don't need to
 be cops.

Q. It sounds like -- and you correct
 me if I am wrong, because that's what I'm here
to do is ask questions and get your testimony
 -- that your complaints relative to race
 discrimination are not so much that you are
 black, it is -- it is the fallout from you
 disciplining other black officers and taking
 personnel decisions against other black
 officers.

MS. HAYNES: Object to form. Do you understand?

 A. Repeat it again.

Q. (BY MR. SPEAGLE:) Sure. Sure.
Again, you had a good, long
open-ended answer, just as I asked –

A. Right.

Q. -- and it sounds to me like, and
again, this is a question, that your complaints
of racial discrimination are not so much
because you, Ernest Finley, are black and that
you were targeted for being black, but because
you, Ernest Finley, as chief were disciplining
black officers?

MS. HAYNES: Object to form.

A. I think that the expectation of
being a black man in that position, the
expectation was to give -- to give this
individual a break.

Q. (BY MR. SPEAGLE:) By individuals,
you mean other black –

A. Black individuals.

Q. And you, Chief Finley, were not
going to do that?

MS. HAYNES: Object to form.

A. I'm going to do my job based on
the facts that are in front of me.

(Finley Depo. Vol. 1, pp.122-124.)

Plaintiff, without citing any abuse of authority or racial animus insisted that the offense was so

egregious that it required termination, without citing any objective racial bias or violation of City

Personnel rules on behalf of Mayor Reed. The Plaintiff admits after considering two discipline

options, the Mayor decided on a suspension with other consequences. The Plaintiff admitted that the

Mayor was within his right not to  follow Plaintiff's recommendation of termination and in doing so

did not violate any personnel policy, **(Exh. B, pp. 184-186).** *Ala. Code* § 11-43-81; Montgomery

AL Ordinance 4.06**.**

Plaintiff also alleges that he suffered harassment, retaliation, and insubordination from officers he supervised at the direction of Mayor Reed. **(Exh. B, p. 186).** Several police officers made complaints against Plaintiff and his leadership and discipline. Without any proof, Plaintiff alleges that Mayor Reed created a conspiracy with disgruntle officers to publicly shame and defame him**. (Finley II Exh., pl 186).**

These allegations arose from the aftermath of the above-mentioned officers and a few others complaining directly to the City Council on April 6, 2021 regarding Plaintiff's perceived harsh supervision, uneven discipline and favoritism shown Plaintiff.

Plaintiff accuses Mayor Reed of maliciously orchestrating community pastors and disgruntled police officers to vilify him in the community as a form of harassment, character destruction, and a base for insubordination toward command staff.

It took the president of the City Council, Mr. Charles Jinright, to refute the false claim that Mayor Reed had a role in calling the Council meeting. Mr. Jinright by deposition stated that Council was contacted by the Clerk about the disgruntled police officers request to get on an agenda to discuss their complaints against Plaintiff and some command staff in the department. Mr. Jinright stated that the full Council voted to approve the officers addressing the council about their concerns and their place was given Agenda Item 22 for the April 6, 2021 meeting. **(Jinright Exh. I, p. 41).**

Mr. Jinright explained earlier in his deposition that City Council sets the agendas not the Mayor. If the Mayor wants an item on the agenda he first contacts the Clerk and not members of council. **(Jinright Exh. I., p.16).** Mr. Jinright went on to testify that he never had a conversation with the Mayor about the aggrieved officers and their counsel speaking at the April 6, 2021 meeting, (Finley I Exh. M **p. 50)**

Plaintiff has come forth with no direct evidence of actions by Mayor Reed against him based on

racial animus which is an essential element to can sustain a claim of hostile work environment. Plaintiff is further lacking key elements of each of his federal claims under, as alleged in his Amended Complaint of actions being taken against him because of his race. No one ever directed racially insensitive language to him or used offensive language in his presence. Nor has he alleged or presented any evidence he was subjected to physical discomfort or fear. Finley simply has put for no evidence to make defeat summary judgement under either of his Count V, X or XI of his Amended Complaint. In the face of this evidentiary gap, Finley attempts to conveniently recast some of his discrete routine disciplinary activities as allegations in terms of a hostile work environment. Discrete acts of discrimination cannot, however, be reframed as a hostile work environment claim. *McDill v. Bd. of Pardons & Paroles*, No. 2:18CV597-MHT, 2022 WL 597337, at *9 (M.D. Ala. Feb. 28, 2022) (allegations that "harsher discipline was received by black employees, and complaints of discrimination were subject to retaliation and not investigated," concerned "patterns of discrimination practiced against black employees, which constitute discrete acts that must be challenged as separate statutory discrimination and retaliation claims [and not as a] hostile work environment claim that centers on discriminatory intimidation, ridicule, and insult") (citing *McCann v. Tillman*, 526 F.3d 1370, 1378-79 (11th Cir. 2008) (internal citations and quotation marks omitted)); *Eaves v.. Cajun Operating Company d/b/a Church's Chicken, et al.*, No. 2:19-CV-1094-ECM, 2022 WL 453531, at *5 (M.D. Ala. Feb. 14, 2022) (allegations of disparate treatment and retaliation "constitute discrete acts that must be challenged as separate statutory discrimination and retaliation claims" and "cannot be brought under a hostile work environment claim that centers on 'discriminatory intimidation, ridicule, and insult.'" (citing *McCann*, 526 F.3d at 1379 (citation omitted)); *Joiner v. Hines*, No. 2:19-CV-374-WKW, 2021 WL 2926293, at *10–11 (M.D. Ala. July 12, 2021) (Plaintiff's claims for hostile work environment due to failure to promote; denial of training opportunities; disparate pay; and disparate treatment were "discrete discriminatory acts" that "must be challenged as separate statutory violations and not lumped together

30

under the rubric of hostile work environment.") (citing *McCann* 2006 WL 1867486 at *20 (S.D. Ala. July 6, 2006), *aff'd, sub nom. McCann v. Tillman*, 526 F.3d 1370 (11th Cir. 2008)).

Thus, to the extent that Finley attempts to allege that he was forced to resign from his "at will" position and, subjected to discriminatory and retaliatory acts where he claims he was denied the right to speak at a public meeting are not hostile work environment prerequisites that will sustain a hostile work environment claim. Defendants circumstances as alleged by Plaintiff do not exist as alleged and presented up to this point.

But even if this Court were to assume that all of the acts about which Plaintiff complains could properly be considered harassment, these Defendant Reed is still entitled to summary judgment. As a result, Defendant Reed has analyzed all of the alleged harassing actions, even the ones that may not be considered appropriate under a hostile work environment analysis.

"[D]iscrimination claims, including hostile work environment claims, brought under … 42 U.S.C. § 1981[ ] or Title VII … are subject to the same standards of proof and employ the same analytical framework." *Bryant v. Jones*, 575 F.3d 1281, 1296 n.20 (11th Cir. 2009) (citations omitted). Section 1983 claims likewise carry the same elements. *Stallworth v. Shuler*, 777 F.2d 1431, 1433 (11th Cir. 1985) ("[w]here, as here, a plaintiff predicates liability under Title VII on disparate treatment and also claims liability under sections 1981 and 1983, the legal elements of the claims are identical.")(other citation omitted). To establish a hostile work environment claim, generally, a plaintiff must show that "the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (citations omitted). To prevail on a hostile work environment claim, a plaintiff must prove: (1) he belongs to a protected class, (2) he was subjected to unwelcome harassment (3) the harassment was based on a protected characteristic, (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of her employment,

and (5) the employer was responsible. *Copeland v. Georgia Dep't of Corrections*, 97 F.4th 766, 774-75 (11th Cir. 2024).

First Plaintiff must show (1) he belongs to a protected class. As a Black male over the age of 40, Finley is a member of a protected class under both Title VII and 42 U.S.C. § 1983. The amended complaint explicitly identifies Finley as African-American, thus satisfying the first element.  Next, Finley must show (2) he was subjected to Unwelcome Harassment; Finley alleges that he was subjected to harassment, retaliation, and insubordination. Specifically, he asserts that false complaints were lodged against him, he was prohibited from defending himself at a City Council meeting, and he claims Mayor Reed encouraged others to file complaints against him and also claims he felt threatened by Mayor Reed and forced to resign.  (Finley Depo. Vol 1. p. 212, Doc. 42, 44 ¶), However, the next three elements is where Plaintiff's case falls flat.  The third prong is (3) Harassment was based on a protected characteristic. This element requires Finley to demonstrate that the harassment was motivated by his race. The Amended Complaint asserts that Mayor Reed, a Black male, believed Finley, also a Black male, should not have investigated or disciplined Black police officers. It is alleged that Mayor Reed wanted Finley to favor Black officers in his management of the police department and claim the Mayor took actions against Finley for not adhering to this preference. (Finley Depo 1, pp. 119-121)  Significantly, during his deposition, when asked about racial discrimination, Finley stated that his complaints were not so much because, he, Ernest Finley, was Black, but because he was disciplining Black officers and doing his job.  Finley's testimony was clear and unequivocal that race was not the reason he was "targeted" by officers  in response to the question about whether his race was the reason he was "targeted". His testimony on this critical issue was noted above, bears repeating here:

"Q. -- and it sounds to me like, and
again, this is a question, that your complaints
of racial discrimination are not so much
because you, Ernest Finley, are black and that

32

you were targeted for being black, but because
you, Ernest Finley, as chief were disciplining
black officers?

MS. HAYNES: Object to form.

A. I think that the expectation of
being a black man in that position, the
expectation was to give -- to give this
individual a break.

Q. (BY MR. SPEAGLE:) By individuals,
you mean other black –

A. Black individuals.

Q. And you, Chief Finley, were not
going to do that?

MS. HAYNES: Object to form.

A. I'm going to do my job based on
the facts that are in front of me."

(Finley Depo. Vol. 1, pp.122-124.)

Clearly Plaintiff was expressing, when going after "corrupt cops" he  claimed to be doing with
the MPD Off-Duty Employment Investigation, that being "targeted" by officers who are subject to the
discipline comes with the territory, not because of race.

The fourth element is (4) the harassment was Sufficiently Severe or Pervasive. To meet this
element, the harassment must be sufficiently severe or pervasive to alter the terms and conditions of
employment. Finley argues that the actions against him, including the false complaints, public
humiliation at the City Council meeting, and the Ethics Commission investigation, created a hostile
work environment. He contends that these actions were intended to force his resignation and damaged
his professional reputation. This requires the harassment to be severe or pervasive enough to alter
employment conditions. Finley points to false complaints, public humiliation, and the Ethics
Commission investigation. The incidents must be more than isolated or trivial, and their cumulative

effect must have made Finley's workplace intolerable .(*Copeland, supra*)  As Finley testified in his deposition cited on the previous element, being targeted, is so many words, *comes with the territory*. Clear intolerable circumstances do not exist for Plaintiff in this circumstance.  *As Finley testified earlier* If Finley's facts are deficient, he may struggle to demonstrate that these incidents were sufficiently severe or pervasive to create an objectively hostile work environment.

The 5th and final element is Employer Responsibility. The final element requires proving that the employer is responsible for the harassment. In this case, Finley is suing the City of Montgomery and Mayor Reed. Finley alleges that Mayor Reed, acting in his official capacity, orchestrated and encouraged the harassment. He claims that Reed lodged false complaints, prohibited Finley from speaking in his defense, and influenced the Ethics Commission investigation. Mayor Reed denies being responsible orchestrating and encouraging the harassment, and Finley has only put for mere allegations. Finley also fails the final prong of the test and summary judgment is warranted as a matter of law.

"It is a 'bedrock principle that not all objectionable conduct or language amounts to discrimination under Title VII.'" *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1297 (11th Cir. 2012) (quoting *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 809 (11th Cir. 2010) (en banc)). "Therefore, only conduct that is 'based on' a protected category, such as race, may be considered in a hostile work environment analysis." *Id*. Behavior that is merely unfair or rude, but not tied to a protected characteristic, does not support a hostile work environment. *Hunsaker v. Found. Partners Grp.*, No. 6:18-cv-1996-Orl-22DCI, 2020 WL 10355118, at *11 (11th Cir. 2020) (citing *Coutu v. Martin Cnty. Bd. of Cnty. Comm'rs*, 47 F.3d 1068, 1074 (11th Cir. 1995)).Absent any allegation about discrimination based on a protected ground, Plaintiff's grievances alleging unfair treatment are not statutorily-protected conduct. *See Coutu v. Martin Cty. Bd. of Cty. Comm'rs*, 47 F.3d 1068, 1074 (11th Cir. 1995) ("Unfair treatment, absent discrimination based on race, sex, or national origin, is *not* an

unlawful employment practice under Title VII." (emphasis in original)); *Bowens v. Escambia Cnty. Bd. of Educ.*, No. 22-11560, 2023 WL 4145424, at *4 (11th Cir. June 23, 2023).

In hostile work environment cases there are different standards of liability depending on whether the harasser was the plaintiff's coworker or supervisor. In cases alleging liability for supervisor harassment.

> An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages.... The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any [ ] harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise....

*Burlington Indust., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998); *see also Faragher*, 524 U.S. at 807-08.

Although the presence of an anti-harassment policy does not automatically satisfy the first element of the *Faragher/Ellerth* defense, "the presence of such a policy is nevertheless a highly relevant factor," and the Eleventh Circuit has consistently held that an employer has satisfied its burden on the prevention prong of the first element of this defense when there is evidence that the employer had a comprehensive anti-harassment policy that is effectively communicated to its employees and contains reasonable complaint procedures. *Minix v. Jeld-Wen, Inc.*, 237 Fed. App'x 578, 584 (11th Cir. 2007) (unpublished opinion) (citing *Frederick v. Sprint*, 246 F.3d 1305, 1315 (11th Cir. 2001)).

Finley acknowledge being in receipt of the City's no harassment and discrimination policy (Finley Depo II, pp. 389-380.

Accordingly, Finley has failed to establish elements 3 through five of his *prima facie* case and cannot, therefore establish that there is a disputed issue of material fact. Defendant Reed is entitled to summary judgment on Finley's 14th Amendment Equal Protection Hostile Work Environment claim racial animus under Counts V.

2.    **No Conspiracy to Violate Plaintiff's Free Speech, Due Process and Equal Protection Under Counts X and XI**

Equal Protection Clause discrimination claims are subject to the same standards of proof and use the same framework as intentional discrimination claims brought  under Title VII and § 1981.Bryant v. Jones, 575 F.3d 1281, 1296 n.2.0 (11th Cir. 2009). So, to establish a violation of the Equal Protection Clause, a plaintiff must prove discriminatory motive or purpose. Whiting v. Jackson State Univ., 616 F.2d 116, 122 (5th Cir. 1980).  This holds true when the plaintiff relies on circumstantial evidence of to prove retaliation and discrimination.

The Plaintiff asserts that Defendants conspired to violate his civil rights, more particularly, his "constitutionally-protected speech" regarding matters of public concern of alleged "abuses in the Police and Mayor's Department." *(Doc.42, ¶213)*. Without any citation to  any  specific, "articles participated in or generated by plaintiff and numerous statements or presentations before the City, its officers, and community reports," he submits, "[s]peech played a substantial part in Defendants' decision  to  discharge  Plaintiff as Chief of Police." *(Doc.42,¶214).* Finally, without identifying in any way, allegedly who did what, where, when, or how, he conclusively  states, "The City and Reed committed acts to further the conspiracy."  *(Doc. 42, ¶ 216)*.

Relevant to any determination of whether there has been a violation of the First Amendment is the question of whether the public employee's petition addresses a  matter  of  public  concern. *Grigley v. City of Atlanta*, 136 F.3d 752, 755-56 (11th Cir. 1998). The rationale of the public concern requirement:

36

'applies to expression that takes the form of a petition as well as expression that takes the form of speech,' because '[t]he Petition Clause is not entitled to any greater protection than the Free Speech Clause.'

*D'Angelo v. Sch. Bd. of Polk County, Fla.*, 497 F.3d 1203, 1212 (11th Cir. 2007) (quoting Grigley, 136. F.3d at 755). Thus, in order for a public employee to assert a First Amendment Claim, he has to establish that he made his petition both "on a matter of public concern and as a citizen." If a petition fails these threshold questions, then it is not entitled to protection under the First Amendment. *Id*. Thus, Plaintiffs petition fails here.

Plaintiff claims that Mayor Reed attempted to silence him at the April 6, 2021 council meeting intentionally robbing him of his right to refute his critics. The allegation from Plaintiff was stated as follows: Plaintiff testified Mayor Reed did state that things would blow over. Plaintiff expressed his opinion that Mayor Reed's attitude and opinion towards him changed after the initiation of a City investigation and the disciplining of several black officers. He believed that Mayor Reed was influenced by others' hatred and disrespect for his and Jennifer Reaves' positions. (Exh L, Finley

2nd Depo., pp.461:16 – 462:18.

Last after incorporating his allegations in Count X, Plaintiff attempts to plead an additional count of conspiracy to violate his civil rights by adding in Count XI, and the unsupported claims that "Defendants' conduct was driven by a race-based invidious discriminatory animus against Plaintiff (sic). Defendant *believed (emphasis added)* that Reaves should not have been selected  as Deputy because of her race. . . (**Doc. 42, ¶219**).

The burden is on Plaintiff to provide sufficient evidence of prohibited bias towards him that infringed his protected speech.  In part, this goes back to Plaintiff's allegations that his character was being maligned at the April 6, 2021 City Council Meeting where the Mayor asked him not to speak "things would blow over" regarding complaints against him from disgruntled officers.

To state a claim under 42 U.S.C. § 1985(3), a plaintiff must allege: (1) defendants engaged in a conspiracy; (2) the conspiracy's purpose was to directly or indirectly deprive a protected person or class the equal protection of the laws, or equal privileges and immunities under the laws; (3) a

conspirator committed an act to further the conspiracy; and (4) as a result, the plaintiff suffered injury to either his person or his property, or was deprived of a right or privilege of a citizen of the United States. *Jimenez v. Wellstar Health Sys.,* 596 F.3d 1304, 1312 (11ᵗʰ Cir. 2010).

It is settled law that "a governmental employer may impose certain restraints on the speech of its employees, restraints that would be unconstitutional if applied to the general public." *Theater, 449 F.3d at 1354 (full citation omitted).* Further, ("In a law enforcement agency, there is a heightened need for order, loyalty, morale and harmony, which affords a police department more latitude in responding to the speech of its officers than other government employers."); *Anderson v. Burke Cnty., 239 F.3d 1216, 1222 (11th Cir. 2001).*

In *Tommia Dean* v. *Neil Warren*, Docket No. 19-14674 (11ᵗʰ Cir. September

 2021 , the U. S. Eleventh Circuit addressed the standards required to violate civil

rights under 42 U.S.C. §1985. The court stated that a civil rights violation which contravenes section 1985 requires the plaintiff to allege that the defendant conspired against him "for the purpose of depriving... any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws." This includes demonstrating "some racial, or perhaps otherwise class-based, invidiously discriminatory animus" behind the defendant's actions taken in furtherance of the conspiracy (Id. pages 8-9). The court also emphasized that the animus standard requires that the defendant proceeded on his course of conduct "because of, not merely in spite of, its adverse effects upon an identifiable group" (Id. page 9).

In fact, "the state's interest in regulating the conduct of its employees is perhaps at its greatest where paramilitary organizations, such as a police force, are involved." *Thaeter, 449 F.3d at 1354 n.10* (quotations omitted). Last, in Count IX, Plaintiff has not shown or alleged that he was  stopped from speaking on a public rather than personal concern which is some cases is permitted even by

police officers. *See Alves v. Bd. of Regents of the Univ. Sys. of Ga., 804 F.3d 1149, 1162 (11th Cir. 2015).*

Next Plaintiff starts to lay out the history of the members of the police department and the Mayor who in some form conspired to resist his appointing Ms. Jennefer Reaves to the position of Deputy Chief. Plaintiff starts with Major Saba Coleman. (Finley II Exh., p. 76).

Plaintiff spun the accusation against Major Coleman thusly: "She in my opinion, is very connected to the mayor's office. One of the - - one of the situations with Coleman that was disturbing to me in terms of my tenure with the police department is that she went to my secretary to have a conversation with my secretary to let her know that the mayor's administrative staff, Ms. Jamyla Paul - - Philyaw is looking for negative information about me to present to the mayor for possible action to be taken against me." (FinleyII, Exh. B, p. 78)". When asked did he have a follow-up subsequent discussion with Major Coleman Plaintiff responded no, he was already terminated. (Finley II Exh., p. 80).

Another conspirator that Plaintiff mentioned often was Byron Butler. Butler is ex-police officer who served under Plaintiff at one point. Byron Butler, an investigator with the Ethics Commission, was mentioned as having an ax to grind with Plaintiff (Finley II, Exh. B, p.90). Plaintiff believed Butler should be in jail for his actions during the investigation ( Finley II, Exh. B, p.90). Butler was not an employee of the City of Montgomery or the MPD at the time of the investigation (Finley II, Exh. B, p.91).

Plaintiff attempted to create this so-called conspiracy against him and his civil rights when he took the deposition of retired Lieutenant Marcus Webster. Webster is one of the disgruntled officers who organized the City Council meeting of April 6,

2021. As to the so called chief conspirator, Mayor Steven L. Reed, Webster stated that

he had no text messages or call messages between him and Mayor Reed, Major Denise

Barnes, or other individuals who included Chip Hill, the Mayor Chief of Staff and

Jamyla Philyaw his administrative assistant. (Exh, I, Webster Depo., p.132-136).

Defendant Reed reasserts his evidence from p. 24 of this brief as follows:

"Ethics Investigator Byron Butler stated that he did not conspire against Plaintiff

with Mayor Reed in the filing or investigation of charges leveled against Plaintiff by

Lt. Webster. (Exh. J, Butler Depo., pp.100-102.  And, Cynthia Raulston Ethics

Commission Attorney, said nothing whatsoever in her deposition about speaking with

or communication with Mayor Reed."

And again, "Plaintiff testified that he had no specific evidence that Mayor Reed

caused false complaints to be forwarded to the Ethics Commission but believed that

Byron Butler had multiple meetings with the mayor and City Attorney Stacy Bellinger,

who pursued charges against him and Chief Reaves.  (Raulston, Exh L, pp. 455:19 - 457:10).

Mayor Reed and Byron have directly refuted this allegation.

For the above stated reasons, Plaintiff has not stated an actionable conspiracy to

violate civil rights claim against Mayor Reed under 42 U.S.C. 1985 under both his

complaint Counts XI and XII and summary judgment is due to be granted in favor of Defendant

Reed as a matter of law.

**B.    STATE LAW CLAIMS**

**1.  Count XII – Civil Conspiracy Due Process, Protected Speech.**

Under Alabama law, "'liability for civil conspiracy rests upon the existence of an underlying

wrong and [that] if the underlying wrong provides no cause of action, then neither does the

conspiracy.'" *Mooneyham v. State Bd. of Chiropractic Exam'rs*, 802 So. 2d 200, 206 (Ala. 2001), quoting, *Ex parte Alabama Dep't of Transp.*, 764 So. 2d 1263, 1271 (Ala. 2000), quoting, *Jones v. BP Oil Co.*, 632 So. 2d 435, 439 (Ala. 1993)).  Plaintiff asserts a conspiracy operated to deprive him of a property interest in his position as Chief of Police "by engaging in the violation of his rights under the First Amendment to the U.S. Constitution . . .  to illegally retaliate against Finley for engaging in federally-protected speech and exercising his federally- protected right to speak out on matters of public concern." ***(Doc. 42, ¶ 227-228)***.  As noted in  the plaintiff must plead factual content that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Sinaltrainal*, 578 F.3d at 1261. Conspicuously absent from Count XII of the complaint is any factual content upon which the necessary direct evidence or reasonable inferences can be drawn to support each and or any of the elements of the charge, including the lack of an agreement between Mayor Reed and any other person. Dickerson v. Alachua County Comm'n, 200 F.3d 761, 767 (11th Cir. 2000) (plaintiff must show an agreement between "two or more persons" to deprive him of civil rights).

In Alabama  employment "at will" can be terminated by either party for a nondiscriminatory reason at any time for any reason. *Ex Parte N. Am., 795 So. 2d 674, 677 (Ala. 2001);*

*Nicholson v City of Daphne, 2009 Wl 4667382, at \*5 (S.D. Ala, Nov 25, 2009)*

*(citing Green v City of Hamilton Housing Auth., 937 F.2d 1561 (11th Circ 1991).*

Plaintiff admitted he was an "at-will" employee. This testimony appears in

(Finley I, Exh. M,  Depo., p.226, page 254 line 5, and page 17 line 1.)

Plaintiff also admitted that despite his Amended Complaint allegations, he had no specific

evidence Mayor Reed caused false charges to be brought against him at a council

meeting. When asked to support such allegation , Plaintiff testified "Nothing

specific." (Finley I, Exh. M,  Depo., p.213).

In reference to the Mayor Reed's general non-discriminatory authority over his continued employment, Plaintiff admitted all of the following in his first deposition (Finley I, Exh. M) :

Plaintiff Ernest N. Finley acknowledged that Mayor Reed had the authority to make personnel decisions, including the right to terminate him.  This is reflected in the following Finley I, Exh. M,  testimony and pages:

"The mayor has the right to fire or terminate me." p. 16

"The mayor has the right to make personnel decisions."p.17

"The mayor has the right to fire or terminate me." p.26

"The mayor has the authority to make personnel decisions." p.27

"The mayor can make decisions regarding employment." p.39

" Finley acknowledges that the mayor had the authority to make decisions    regarding termination and suspension." p.106

"Finley states that the mayor had the authority to choose option two (suspension) to discipline officer doing unauthorized off-duty work and that he was acting within his authority." p.185

"Finley mentions that there is no policy requiring the mayor to allow him to speak at a council meeting, implying the mayor's authority in such matters." p.193

"Finley confirms that the mayor had the authority to terminate him and that he served at the pleasure of the mayor.: p.225

"Finley discusses his understanding of his at-will employment status and the    authority to justify actions for immediate removal." p.226

Failing to demonstrate a sufficient predicate of a conspiracy which likely led to loss of his "at will" employment does not exist on these facts.  As a result,  Defendant Reed is entitled to summary judgment as a matter of law under this claim.


**2.   COUNT XIII – Defamation, Libel & Slander**

"In a [defamation] action brought by a public figure, summary judgment for the defendant is appropriate unless the plaintiff produces the clear and convincing evidence that a reasonable jury would need in order to find that the defendant published the defamatory material with actual malice." *Smith v. Huntsville Times Co.*, 888 So. 2d 492, 499 (Ala. 2004), quoting, *McFarlane v. Sheridan Square Press, Inc.*, 320 U.S. App. D.C. 40, 91 F.3d 1501, 1508 (D.D.C. 1996). At this stage of the proceedings, Plaintiff must, present sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. For a claim to have facial plausibility, the plaintiff must plead factual content that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Sinaltrainal,* 578 F.3d at 1261. Plausibility does not require probability, "but it asks for herein, the complaint fails to allege facts to meet this standard. First, plaintiff cannot overcome the fact that the statements attributed to the Defendants were, in fact, true, at the time of publication. Moreover, the complaint fails to allege sufficient facts upon which it can be inferred that that at the time of publication, Defendants were acting, "with knowledge that it was false or with reckless disregard of whether it was false or not." *Smith*, 888 So. 2d 492, 499, (citations omitted). A reckless disregard is demonstrated if, at the time of publication, "the defendant entertained *serious doubts* as to the truth of [its] publication or acted with a *high degree of awareness* of … [its] probable falsity." *Id*. On this point, the complaint is lacking any factual averments beyond "naked assertion[s]' devoid of 'further factual enhancement."

When, as here, the plaintiff is a public figure, he cannot recover unless he proves by clear and convincing evidence that the defendant published the defamatory statement with actual malice, *i.e.*, with 'knowledge that it was false or with reckless disregard of whether it was false or not.' *New York Times v. Sullivan*, 376 U.S. 254,279-280, 11 L. Ed. 2d 686, 84 S. Ct. 710 (1964). Mere negligence does not suffice. Rather, the plaintiff must demonstrate that the

author 'in fact entertained serious doubt as to the truth of his publication,' *St. Amant v. Thompson*, 390 U.S. 727, 731, 20 L. Ed. 2d 262, 88 S. Ct. 1323 (1968), or acted with a 'high degree of awareness of … probable falsity.' *Garrison v. Louisiana*, 379 U.S. 64, 74, 13 L. Ed. 2d 125,85 S. Ct. 209 (1964). *Sanders v. Smitherman*, 776 So. 2d 68, 71 (Ala. 2000).

In his first deposition Plaintiff made several statements support his claims that Mayor Reed's statements or actions were defamatory or slanderous:

1. City Hall Meeting April 26, 2021: Plaintiff claimed that the defamation began at a City Hall meeting where he was not given an opportunity to defend himself, and multiple officers made disparaging remarks about him, which were allowed by Mayor Reed. (Finley I, Exh. M,  , p. 235)

2. News Conference: Finley stated that immediately after the Ethics Commission found him guilty of a minor violation, Mayor Reed held a news conference thanking the Ethics Board for their due diligence, which brought shame and embarrassment to him and his family (Finley I, Exh. M,  p. 235)

3. Ethics Commission Findings: Finley claimed that Mayor Reed's comments about the Ethics Commission's findings were defamatory and damaged his reputation  (Finley I, Exh. M, p.237).

4. Resignation Announcement: Finley mentioned that Mayor Reed's announcement of his resignation included defamatory statements about his performance and the reasons for his departure, portraying him in a negative light (Finley I, Exh. M,  p. 238).

5. Overall Impact: Finley discussed the broader impact of these statements on his career and personal life, stating that they made him appear as a failed leader and contributed to his feeling of being discredited and depressed (Finley I, Exh. M,  p.240).

6. Lack of Retraction: Finley mentioned that despite the defamatory statements,

there was no retraction issued by Mayor Reed or the City, which further damaged his reputation. (Finley I, Exh. M, p.240).

Mayor Reed's public comments on Finley's leadership, job performance, and ethics investigation as were principally as follows:

1. Leadership and Job Performance:

   Finley was hired by Todd Strange and held in high regard by him, but issues arose when Steven Reed became mayor. (Reed Exh. F p.227).

   Finley felt under the microscope and unable to perform his job effectively. (Reed Exh. F, p228)

   Officers complained about Finley from day one, indicating dissatisfaction with his leadership. (Reed Exh. F. p. 235)

   Reed had to make his own judgment about the officers' complaints.( Reed Exh. F, p236)

   Circumstances involving Finley's resignation were related to crime trends and allegations of improper conduct within the department. Reed Exh. F. p154

   Reed highlighted issues with officer morale and confidence in leadership. (Reed Exh. F, p157

   Reed's office announced Finley's resignation and emphasized the need for new leadership to address current crime trends. (Reed Exh. F. p168-169)

   Reed mentioned a nationwide search for a new police chief to lead public safety in the city. (Reed Exh. F, p171-172)

### 2.1    Ethics Investigation:

Reed does not publicly comment on ongoing legal matters or personnel issues, including the ethics investigation involving Finley. (Finley I Exh M, p287)

Reed implied a decision to replace Finley was in the best interest of the Montgomery Police Department and its residents. (Reed Exh. F. p290)

Reed reiterated his stance on not commenting on ongoing legal matters.

Reed does not recall specific conversations or requests to comment on the ethics investigation of Finley and Reaves.  (Reed Exh. F, p293)

This testimony from Mayor Reed clearly shows he is moderate and professional in the manner he handled Plaintiff's various job issues.

It cannot be disputed that Plaintiff any statements made by Defendant Reed were true at the time there were made and Plaintiff is a public figure.  Defendant Reed is entitled to summary judgment as a matter of law as to Count XIII. of the Amended Complaint.

### 3.    Count XV – Invasion of Privacy:

Under Alabama law, invasion of privacy consists of four limited and distinct wrongs: intruding into the plaintiff's physical solitude or seclusion; (2) giving publicity to private information about the plaintiff that violates ordinary decency; (3) putting the plaintiff in a false, but not necessarily defamatory, position in the public eye; or (4) appropriating some element of the plaintiff's personality for a commercial use. *Johnston v. Fuller, 706 So. 2d 700, 701 (Ala. 1997).*

"[T]here must be something in the nature of prying or intrusion and the intrusion must be something which would be offensive or objectionable to a reasonable person. The thing into which

there is intrusion or prying must be, and be

entitled to be, private." *Hogin v. Cottingham,* 533 So. 2d 525, 531 (Ala. 1988) (internal quotations omitted) (emphasis in original). The first step in the analysis is determining whether the information "is entitled to be[] private." *Id.*

Here, there is no evidence that Mayor Reed actively worked against Finley, casting him in a negative and false light and ostracizing him in a negative way to other police officers or the public. There is no evidence that Reed encouraged officers to speak at the City council meeting. There is no evidence that the City and the Mayor forwarded false and fraudulent complaints against Finley to the Alabama Ethics Commission. There is also no evidence that Defendant Reed or the City issued a press release that was circulated to media disparaging Finley. There is no evidence that the Defendants placed Finley in a false light by spreading false information about his employment, work product, ethics and business circumstances.

Count XV primarily makes only the following conclusory allegations: Defendants conspired to bring false charges and fabricated evidence against Plaintiff (see Doc. 42, ¶251) and defendants intruded into Plaintiff's private affairs (see Doc. 42, ¶¶252-253). Such conclusory allegations do not fit the tests laid out in *Johnston, supra.* and Count XV is therefore due for summary judgment.

## VI.   QUALIFIED IMMUNITY FOR COUNTS V, X AND XI

Even if Defendant Reed is not entitled to summary judgment on the federal claims against them in Count V Equal Protection Hostile Work Environment by supervisors, Count X  (Equal Protection Hostile Work Environment by co-workers, Count XI (Race discrimination  §1985,) and XI (Conspiracy to Violate Due Process Clause), he is entitled to Qualified Immunity on those claims. Qualified immunity protects public employees "from suit in their individual capacities for discretionary actions

performed in the course of their duties." *Carter v. Butts Cty., Ga.*, 821 F.3d 1310, 1318 (11th Cir. 2016).

Qualified immunity "offers complete protection for government officials sued in their official capacities

if their conduct does not violate clearly established statutory or constitutional rights of which a

reasonable person would have known." *Brown v. City of Huntsville, Ala.*, 608 F.3d 724, 733 (11th Cir.

2010)(citations omitted). To establish the qualified immunity defense, the Mayor Reed in this case must

demonstrate that he was acting within the scope of his discretionary authority. *Case v. Eslinger*, 555

F.3d 1317, 1325 (11th Cir. 2009). After that showing is made, the burden then shifts to the plaintiff to

overcome the defense of qualified immunity. *Id.* A plaintiff can demonstrate that qualified immunity

does not apply by showing "(1) the defendant violated a constitutional right, and (2) the right was clearly

established at the time of the alleged violation." *Moreno v. Turner*, 572 Fed. App'x. 852, 855 (11th Cir.

2014). "Failure to establish *both* prongs of this test will preserve a finding of qualified immunity. *Edger*

*v. McCabe*, 572 F. Supp. 3d 1143, 1153 (N.D. Ala. 2021) *citing Payton v. City of Florence, Ala.*, 413

Fed. Appx. 126, 131 (11th Cir. 2011). Since failure to establish both prongs results in a finding of

qualified immunity, the Court may address them in either order. *Jones v. Fransen*, 857 F.3d 843, 851

(11th Cir. 2017).

Reed, was always acting within his discretionary authority when he  took the acts that Finley

contends were discriminatory. To determine whether an official was acting within the scope of his or

her discretionary authority, courts consider whether the official "was (a) performing a legitimate job-

related function (that is, pursuing a job-related goal), (b) through means that were within his power to

utilize." *Holloman ex. Rel. Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004). It is clear from

Plaintiff's allegations and the evidence in this case that Mayor Reed was acting within his  job-related

functions when making personnel decisions regarding Finley. *Ala. Code* § 11-43-81; Montgomery

AL Ordinance 4.06, Accordingly Mayor Reed,  satisfies the first part of the qualified immunity test

and the burden shifts to Finley to allege facts that plausibly establish Mayor Reed is not entitled to

qualified immunity. *Bowen*, 826 F.3d at 1319 (citation omitted).

In order to defeat the individual defendants' entitlement to qualified immunity, Finley  must now show that Reed violated his constitutional rights and that, at the time of the alleged violation, those rights were clearly established in light of the specific context of this case. *Gaines v. Wardinski*, 871 F.3d 1203, 1208 (11th Cir. 2017). Under governing Eleventh Circuit precedent, a right can be clearly established in one of three ways whereby the Plaintiff must point to either (1) "case law with indistinguishable facts," (2) "a broad statement of principle within the Constitution, statute, or case law," or (3) "conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law." *Crocker v. Beatty*, 995 F.3d 1232, 1240 (11th Cir. 2021), *cert. denied*, 142 S. Ct. 845, 211 L. Ed. 2d 522 (2022) (citation omitted). Although the Eleventh Circuit has recognized that options two and three can suffice, the Supreme Court has warned courts not to "define clearly established law at a high level of generality." *Id*. (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014) (quotation marks omitted)). "For that reason, the second and third paths are rarely-trod ones." *Id*. (citing *Gaines v. Wardynski*, 871 F.3d 1203, 1209 (11th Cir. 2017) (collecting cases)). "And when a plaintiff relies on a 'general rule' to show that the law is clearly established, it must 'apply with obvious clarity to the circumstances.'" *Id*. (quoting *Long v. Slaton*, 508 F.3d 576, 584 (11th Cir. 2007) (quotation marks omitted) (cleaned up); *see also Youmans v. Gagnon*, 626 F.3d 557, 563 (11th Cir. 2010)

Finley alleges violations of his  First Amendment and Fourteenth Amendment Equal Protection rights as well as his  Due Process Rights.  To establish that the defendant is not entitled to qualified immunity on these claims, Finley must show that he had a clearly established constitutional right (1) to a non-hostile work environment, (3) to speak on the matters she claims was prohibited (4) for due process protection.  Finley  cannot meet this burden.

Only cases decided by the United States Supreme Court, the Eleventh Circuit, or the Supreme Court of Alabama can clearly establish a right. *Amnesty Int'l, USA v. Battle*, 559 F.3d 1170, 1184 (11th

Cir. 2009). Furthermore, the controlling authority must be more than a general statement of the law. It must instead be factually similar to the case at bar and it must pre-date the conduct at issue. *See Mercado v. City of Orlando*, 407 F.3d 1152, 1159 (11th Cir. 2005). For all of the reasons stated above, there is no clearly established law or controlling authority that the Defendants violated any of the Plaintiff's constitutional rights. Consequently, Finley cannot defeat the individual defendants' entitlement to qualified immunity.

Under the second part of the qualified immunity analysis, Plaintiff can overcome his burden "by showing that the facts alleged make out a violation of a constitutional right and that the constitutional right was clearly established at the time of the conduct." *Bowen*, 826 F.3d at 1319 (citation omitted). Accordingly, the issues become: (1) whether, taken in the light most favorable to the Plaintiff, the facts show that Defendant violated his rights, and (2) if so, whether that right was clearly established. *Id.* Defendants submit that Finley cannot prove either prong of this analysis.

Although there is a clearly established right to a workplace free of unlawful harassment, as set forth in detail above there is no evidence that the actions by Reed, were harassment based upon Finley or race, or that the actions taken by them were severe or pervasive. In addition Finley was not prohibited by Reed, from speaking about any issue protected by the First Amendment. There is no evidence of a conspiracy by Reed,. Finally, the Eleventh Circuit has held that public employees complaining of unlawful employment actions cannot state a claim for a violation of their substantive due process rights, (which Finley appears to be claiming)  in *McKinney v. Pate*. 20 F.3d 1550 (11th Cir. 1994). Finley cannot establish that these Defendants violated his constitutional rights. And on the Due Process claim, even if this Court were to recognize such a right, it was not clearly established and Reed, are entitled to qualified immunity. Because there is no authority from the Eleventh Circuit to support Finley's claims, Defendant Reed is entitled to qualified immunity.

## V. <u>STATE AGENT IMMUNITY - SECTION 11–47–190 IMMUNITY</u>

Section 11–47–190, *Ala. Code* provides, in pertinent part, that "[n]o city or town shall be liable for damages for injury done to or wrong suffered by any person or corporation, unless such injury or wrong was done or suffered through the neglect, carelessness, or unskillfulness of some agent, officer, or employee of the municipality...." Ala.Code § 11–47–190. The effect of § 11–47–190 is that "a city is liable for negligent acts of its employees within the scope of their employment, but not intentional torts of its employees." <u>Waters v. City of Geneva</u>, 47 F. Supp. 3d 1324, 1340 (M.D. Ala. 2014) quoting *Brown v. City of Huntsville, Ala.,* 608 F.3d 724, 742–43 (11th Cir.2010).

In this case, Finley has alleged Invasion of Privacy (Count XII), Conspiracy/Due Process – (Count XIII), Defamation – Slander Per Se and Libel Per Quad and  (Count XV) Invasion of Privacy. See <u>Waters,</u> 47 F. Supp. 3d at 1340 (Invasion of privacy); *Garcia v. Casey*<u>, 75 F.4th 1176, 1192–93 (11th Cir. 2023)</u>(Defamation); *Cottrell v. Nat'l Collegiate Athletic Ass'n*, 975 So. 2d 306, 333 (Ala. 2007) (where plaintiff is a public official there must be proof of "actual malice—that is, with knowledge that it is false or with reckless disregard of whether it was false or not."); (*Elliott Elec. Supply, Inc. v. Veep Elec. Serv., Inc.*, No. CL-2023-0534, 2024 WL 3546764, at *4 (Ala. Civ. App. July 26, 2024)(element of cause of action is intentional interference). Thus, section 11–47–190 provides immunity to the Defendant Reed and the City.

## VI.    <u>CONCLUSION</u>

For all of the reasons set forth herein, summary judgment is due to be entered in favor of all Defendant Reed against the Plaintiff as a matter of law.

Respectfully submitted this the 12th day of  March, 2025.

.

       /s/ Ronald B. Hatcher
Ronald B. Hatcher (ASB-6810-A-39R)
Attorney for Defendant Mayor Steven L. Reed, Individually
Davis Hatcher Law, P.C.

4183 Carmichael Road, Ste. B
Montgomery, AL 36106
(334) 270-0592
rhatcherlaw@gmail.com

   /s/ Terry G. Davis
Terry G. Davis (ASB-1565-A-64T)
 Davis Hatcher Law, P.C.
 Attorney for Defendant Mayor Steven L. Reed,
Individually
4183 Carmichael Road, Ste. B
Montgomery, Al 36106
(334) 270-0592
 tdavis@dhlaw1.com

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court

using the CM/ECF system which will send notification of such filing to the following parties

or counsel:

Heather Leonard, PC
2105 Devereux Circle; Suite 111
Birmingham, AL 35242
205-977-5421
Fax: 205-278-1400
Email: heather@heatherleonardpc.com

Alicia Kay Haynes Haynes &
Haynes, PC 1600 Woodmere
Drive
Birmingham, AL 35226
205-879-0377
Fax: 205-879-3572
Email: akhaynes@haynes-haynes.com

Scott Michael Speagle. Esq.
Orin C. Odom, III
Webster Henry Lyons Bradwell Cohan & Speagle, P.C.
 105 Tallapoosa Street, Suite 101
Montgomery AL 36104
(334) 264-9472
scott@websterhenry.com

odom@websterhenry.com

Done this  12th day of March, 2025.

/s/ Ronald B Hatcher

OF COUNSEL